Filed 5/23/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| WILLIAM B. WEBB et al., | ) | |
| | ) | |
| Plaintiffs and Appellants, | ) | S209927 |
| | ) | |
| v. | ) | Ct.App. 2/1 B233189 |
| | ) | |
| SPECIAL ELECTRIC COMPANY, INC., | ) | Los Angeles County |
| | ) | Super. Ct. No. BC436063 |
| Defendant and Respondent. | ) | |
| _____ | ) | |

Plaintiff William Webb was injured by exposure to asbestos products and sued a raw asbestos supplier for failing to warn him about the danger. His case raises a question about the extent of a supplier's duty to warn. Specifically, when a company supplies a hazardous raw material for use in making a finished product, what is the scope of the supplier's duty to warn ultimate users of the finished product about risks related to the raw material? The answer implicates a defense known as the sophisticated intermediary doctrine.[1] Although all sellers in a

---

[1] Terminology in this area of law is notoriously confusing. We retain the name used in California cases to describe the defense arising from the Restatement Third of Torts, Products Liability (1998) section 2, comment i, page 30, and its predecessor, the Restatement Second of Torts (1965) section 388, comment n, page 307. (See *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1292; *Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 29-30). Elsewhere, the defense has sometimes been called the "sophisticated purchaser" (*Cabasug v. Crane Co.* (D. Haw. 2013) 988 F.Supp.2d 1216, 1224-1228; *In re Asbestos Litigation* (Del.Ct.App. 1986) 542 A.2d 1205, 1209) or "learned intermediary" (*Aubin v. Union Carbide Corp.* (Fla. 2015) 177 So.3d 489, 516, 518; *Humble Sand & Gravel, Inc. v. Gomez* (Tex. 2004) 146 S.W.3d 170, 190) defense. The

SEE CONCURRING AND DISSENTING OPINION

product's distribution chain have a duty to warn about known hazards, they may in some cases discharge that duty by relying on others to warn downstream users. (Rest.3d Torts, Products Liability, § 2, com. i, p. 30.)

When a hazardous raw material is supplied for any purpose, including the manufacture of a finished product, the supplier has a duty to warn about the material's dangers. Under the sophisticated intermediary doctrine, the supplier can discharge this duty if it conveys adequate warnings to the material's purchaser, or sells to a sufficiently sophisticated purchaser, and reasonably relies on the purchaser to convey adequate warnings to others, including those who encounter the material in a finished product. Reasonable reliance depends on many circumstances, including the degree of risk posed by the material, the likelihood the purchaser will convey warnings, and the feasibility of directly warning end users. The doctrine balances the competing policies of compensating those injured by dangerous products and encouraging conduct that can feasibly be performed.

## I. BACKGROUND

During the 1970s, Special Electric Company, Inc. (Special Electric) brokered the sale of crocidolite asbestos to Johns-Manville Corporation (Johns-Manville). Crocidolite is the most toxic form of asbestos, several times more likely to cause cancer than the more common chrysotile form.[2] Nevertheless, one

---

Massachusetts Supreme Court called it the "bulk supplier" defense (*Hoffman v. Houghton Chemical Corp.* (Mass. 2001) 751 N.E.2d 848, 854-857); however, as we will discuss, that latter term has come to describe a slightly different tort doctrine. (See *post*, at pp. 11-13.)

[2] "The term 'asbestos' describes six fibrous minerals which fall into two varieties, amphibole and serpentine. The serpentine mineral, chrysotile, is the most commonly used in building products, and makes up more than 90% of all asbestos used. When mined and processed, asbestos is generally separated into thin fibers which are then mixed with a binding agent so the fibers may be used in various products." (*Matter of Celotex Corp.* (Bankr. M.D.Fla. 1996) 196 B.R. 973, 980, fns. omitted.) Individual asbestos fibers are invisible to the naked eye.

Special Electric broker claimed crocidolite was "safer" than other forms of asbestos because he believed it did not become airborne.

Special Electric arranged for the material to be shipped directly from a mining company in South Africa to Johns-Manville plants. It received a commission for the brokered sales but never took possession of the asbestos.[3] Johns-Manville required that the asbestos be shipped in bags with an OSHA warning label, stating: "Caution, contains asbestos fibers. Avoid creating dust. Breathing asbestos dust may cause serious bodily harm." However, the general supervisor of Johns-Manville's Long Beach plant recalled that bags of crocidolite did not bear the labels until the early 1980s.

Johns-Manville was the oldest and largest manufacturer of asbestos-containing products in the country, maintaining plants across the United States and overseas. It also owned and operated a mine in Quebec that was one of the world's largest sources of chrysotile asbestos. Founded in 1858, the company once had 30,000 employees. Its numerous asbestos products included flooring, roofing, siding, cement, and pipe insulation. It also made an asbestos cement pipe known as Transite pipe. Although "Transite" was trademarked by Johns-Manville, the name became a generic term for all brands of asbestos cement pipe.

Although not asked about crocidolite specifically, plaintiffs' epidemiologist knew of no company in the United States more knowledgeable about asbestos than

---

If released, they may become airborne and inhaled. Asbestos that becomes crumbly or easily broken apart is described as friable and is known to pose a health risk. (*Ibid.*)

[3] The company that actually made the sales was named Special Materials, Inc. Although the record does not clearly describe their relationship, it is alleged and undisputed here that Special Electric is liable as a successor for the torts of Special Materials. Special Electric has argued throughout the proceedings that, as a mere broker, it was not in the product's chain of distribution for purposes of strict liability. This argument was not addressed by either of the courts below. Accordingly, the issue is beyond the scope of our grant of review and we do not consider it.

Johns-Manville.  As early as the 1930s, it was aware of health hazards associated with exposure.  It acquired the substance from many different sources and did not look to its suppliers for information about safe handling.  The company had a well-established research department where the chemical characteristics of asbestos were studied.  On occasion, Johns-Manville scientists would meet with Special Electric and other vendors to discuss research.  By the 1950s, Johns-Manville had instituted precautions for safe handling in its facilities.

Johns-Manville's Long Beach plant manufactured Transite pipe.  While the formula did not call for crocidolite asbestos, trace amounts of it could be found in the pipe because Johns-Manville recycled broken or damaged bits of other products during manufacture.  Scraps could comprise up to 20 percent of the components, so long as the asbestos fiber count was kept within a prescribed range.

Johns-Manville sold Transite pipe through various distributors, including Familian Pipe & Supply.  Familian, in turn, sold the pipe to Pyramid Pipe & Supply Co., where plaintiff William B. Webb worked as a warehouseman and truck driver.  Between 1969 and 1979, Webb handled the product as part of his job.  About 10 times a year, he made deliveries to job sites.  The pipe left a dusty residue when handled but bore no warning label.  Webb was not told that Transite pipe dust could cause cancer, nor was he advised to wear a respirator.

In January 2011, Webb was diagnosed with mesothelioma, a fatal cancer caused by inhalation of asbestos fibers.  He and his wife, Jacqueline Webb, sued multiple defendants under strict liability and negligence theories.  They ultimately went to trial against Special Electric and two other companies.  At the close of plaintiffs' case, Special Electric moved for nonsuit on the failure to warn claims.  Special Electric argued, in part, that it had no duty to warn a sophisticated purchaser like Johns-Manville about the health risks of asbestos.  The court deferred ruling pending further briefing.  After both sides rested, Special Electric moved for a directed verdict on plaintiffs' strict liability claims.  The court again

4

deferred ruling. The jury returned a verdict finding Special Electric liable for failure to warn and negligence, but not liable for supplying a defectively designed product.[4] It apportioned 49 percent of fault to Johns-Manville, 18 percent to Special Electric, and 33 percent to other entities.

Before judgment was entered, Special Electric requested a ruling on its nonsuit and directed verdict motions. The court determined Special Electric was not liable for failure to warn and granted the motions. Concerned that these rulings might be procedurally irregular, the court also entered judgment on the jury verdict and construed the motions as seeking judgment notwithstanding the verdict (JNOV). So characterized, the motions were granted and judgment was entered in favor of Special Electric.

A divided panel of the Court of Appeal identified both procedural and substantive error. The majority determined the JNOV ruling was impermissibly premature and lacked the required written notice. It also concluded the entry of JNOV was improper because substantial evidence demonstrated that Special Electric breached a duty to warn Johns-Manville and foreseeable downstream users like Webb about the risks of asbestos exposure. The dissenting justice argued JNOV was proper because Special Electric was entitled to rely on Johns-Manville, a sophisticated purchaser, to warn downstream users about asbestos, and plaintiffs suffered no prejudice from procedural irregularities in the ruling.[5]

We granted review and now affirm. Because substantial evidence supports the jury's verdict, and Special Electric did not have a complete defense as a matter of law, the entry of JNOV was unjustified. In light of this conclusion, we need not reach plaintiffs' claims of procedural error.

---

[4] Plaintiffs had alleged a design defect under the consumer expectations test. (See *post*, p. 7; see also *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178.)

[5] Plaintiffs' appeal also challenged the jury verdict absolving Special Electric of design defect liability. The Court of Appeal did not reach this claim.

## II. DISCUSSION

A product can be defective in its manufacture or design, or because it fails to include a warning about known risks. (Rest.3d Torts, Products Liability, § 2.) Several defenses may be asserted against a failure to warn claim. Two of these are the obvious danger rule and its subset, the sophisticated user rule. (See *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56 (*Johnson*).) Another relevant defense is the component parts rule. (See *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335.) The bulk supplier doctrine, a corollary of the component parts rule, addresses the special considerations that may apply when the component is a raw material as opposed to a manufactured item. (*Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830, 837.) We discuss the development and application of these doctrines in greater detail below.

This case involves a hazardous raw material incorporated in a finished product. The critical inquiry is whether and to what extent the supplier can discharge its duty to warn by relying on others to convey warnings about the hazard. As we will explain, the sophisticated intermediary doctrine provides that a supplier can discharge its duty to warn if it provides adequate warnings, or sells to a sufficiently sophisticated buyer, and reasonably relies on the buyer to warn end users about the harm. Reasonable reliance depends on all attendant circumstances and is typically a question of fact for the jury.

1. *General Principles Concerning the Duty to Warn of Product Dangers*

a. *Types of Product Defects*

The law has long recognized three types of product defects: manufacturing defects, design defects, and " 'warning defects.' " (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995 (*Anderson*); see *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 428 (*Barker*).) Manufacturing defects can arise, for example, when a flaw in the manufacturing process creates a product that differs from what the manufacturer intended. (*Brown v. Superior Court* (1988) 44

6

Cal.3d 1049, 1057 (*Brown*).)  The exploding bottle in *Escola v. Coca Cola Bottling Co.* (1944) 24 Cal.2d 453 is the prototypical example of a manufacturing defect.  (See *Brown*, at p. 1057.)

Design defects appear in products that, although properly manufactured, are dangerous because they lack a critical feature needed to ensure safe use.  (*Brown*, *supra*, 44 Cal.3d at p. 1057.)  We discussed design defects at length in *Barker*, *supra*, 20 Cal.3d 413, establishing two alternative tests for liability.  A product design may be found defective if:  (1) "the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner" (consumer expectations test) (*id.* at p. 432); or (2) the risk of danger inherent in the product's design outweighs the design's benefits (risk-benefit test) (*ibid.*).

The third type of defect "is a product that is dangerous because it lacks adequate warnings or instructions." (*Brown*, *supra*, 44 Cal.3d at p. 1057; see *Barker*, *supra*, 20 Cal.3d at p. 428.)  "Generally speaking, manufacturers have a duty to warn consumers about the hazards inherent in their products." (*Johnson*, *supra*, 43 Cal.4th at p. 64.)  A warning informs consumers about hazards of which they are unaware, so that they can avoid the product or minimize its danger by careful use.  (*Ibid.*)  In California, as in a majority of jurisdictions, liability for failure to warn is conditioned on the manufacturer's actual or constructive knowledge of the risk.  (*Anderson*, *supra*, 53 Cal.3d at p. 1000; *Brown*, at p. 1066.)  The duty to warn applies to all entities in a product's chain of distribution.  (See *Taylor v. Elliott Turbomachinery Co. Inc.* (2009) 171 Cal.App.4th 564, 575.)  Thus, like a manufacturer, a raw material supplier has a duty to warn about product risks that are known or knowable in light of available medical and scientific knowledge.  (See *Anderson*, at pp. 1000, 1002.)

The "known or knowable" standard arguably derives from negligence principles (see *Anderson*, *supra*, 53 Cal.3d at pp. 1000-1001), and failure to warn claims are generally " 'rooted in negligence' to a greater extent than"

7

manufacturing or design defect claims. (*Id.* at p. 1002; see *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1111-1112.) Unlike those other defects, a " 'warning defect' relates to a failure extraneous to the product itself" and can only be assessed by examining the manufacturer's conduct. (*Anderson*, at p. 1002.) These principles notwithstanding, California law recognizes separate failure to warn claims under both strict liability and negligence theories.[6] In general, a product seller will be *strictly liable* for failure to warn if a warning was feasible and the absence of a warning caused the plaintiff's injury. (*Blackwell v. Phelps Dodge Corp.* (1984) 157 Cal.App.3d 372, 377; see *Anderson*, at p. 1002.) Reasonableness of the seller's failure to warn is immaterial in the strict liability context. (*Anderson*, at pp. 1002-1003.) Conversely, to prevail on a claim for *negligent* failure to warn, the plaintiff must prove that the seller's conduct fell below the standard of care. (*Id.* at p. 1002.) If a prudent seller would have acted reasonably in not giving a warning, the seller will not have been negligent. (*Id.* at p. 1003.)

Products liability plaintiffs often allege both design and warning defects. (See *Anderson*, *supra*, 53 Cal.3d at p. 995, fn. 7.) Here, the jury found no design defect. Accordingly, our opinion focuses on failure to warn.[7]

---

[6] The Restatement Third of Torts observes that doctrinal categories such as "negligence" and "strict liability" are not precisely relevant to failure to warn liability, where the overarching inquiry is whether "foreseeable risks of harm posed by the product could have been reduced or avoided" by warnings and the absence of a warning renders the product unsafe. (Rest.3d Torts, Products Liability, § 2, subd. (b); see *id.*, com. n, pp. 35-36.)

[7] In addition to rejecting Special Electric's arguments on failure to warn, the Court of Appeal concluded the jury had rendered a "general negligence verdict" that was not disturbed by the entry of JNOV. Because we agree with the Court of Appeal that the trial court erred in granting JNOV, we need not address this alternate ground for reversal.

b.    *Relevant Defenses*

1)    *Sophistication of the Product User*

Several defenses have developed to mitigate liability in appropriate circumstances.  For example, under the "obvious danger" rule, "there is no need to warn of known risks under either a negligence or strict liability theory."  (*Johnson*, *supra*, 43 Cal.4th at p. 67.)  This defense is based on a Restatement provision stating that warnings are unnecessary if a product's dangers are readily observable and the supplier has reason to expect the user will perceive them.  (Rest.2d Torts, § 388, subd. (b), com. k, pp. 306-307; see *Johnson*, at p. 66.)  "Courts have interpreted section 388, subdivision (b), to mean that if the manufacturer reasonably believes the user will know or should know about a given product's risk, the manufacturer need not warn that user of that risk.  [Citations.]  This is 'especially [true] when the user is a professional who should be aware of the characteristics of the product.' "  (*Johnson*, at p. 66.)

The sophisticated user defense is a particular application of the obvious danger rule.  We recognized this defense in *Johnson*, explaining that "sophisticated users need not be warned about dangers of which they are already aware or should be aware."  (*Johnson*, *supra*, 43 Cal.4th at p. 65.)  Because sophisticated users already know, or should know, about the product's dangers, the manufacturer's failure to warn is not the legal cause of any harm.  (*Ibid*.)  A sophisticated user's knowledge is thus the equivalent of prior notice.  (*Ibid*.)  The defense serves public policy, because requiring warnings of obvious or generally known product dangers could invite consumer disregard and contempt for warnings in general.  (*Id*. at p. 70.)

The sophisticated user defense does not require a user's actual awareness of potential hazards.  Rather, a product manufacturer or supplier is not liable for failing to warn a sophisticated user if the user knew or should have known of the product's risk in light of his training or skill.  (*Johnson supra*, 43 Cal.4th at p. 71.)  "The focus of the defense . . . is whether the danger in question was so generally

9

known within the trade or profession that a manufacturer should not have been expected to provide a warning specific to the group to which plaintiff belonged." (*Id*. at p. 72.) Although other states have adopted different rules, California's sophisticated user defense applies to both strict liability and negligent failure to warn claims. (*Id*. at pp. 71-73.)

The sophisticated user defense has been applied when the *end user* of a product can be expected to know about potential risks due to the user's extensive training or professional experience. For example, in *Johnson* we concluded that an air conditioning equipment manufacturer was shielded from liability for failing to warn a highly trained and certified technician about the risks of exposure to a commonly used refrigerant. (*Johnson*, *supra*, 43 Cal.4th at pp. 61-62, 74.) Somewhat different questions arise when the manufacturer or supplier sells a product to a sophisticated *purchaser*, which then passes the product on to other users. In such cases, the product's immediate purchaser has actual or imputed knowledge of potential risks, but the product's ultimate users may not.

2)      *Component Parts Doctrine*

Another defense protects manufacturers and sellers of component parts from liability to users of finished products incorporating their components. Under the component parts doctrine, the supplier of a product component is not liable for injuries caused by the finished product unless: (1) the component itself was defective and caused injury or (2) the supplier participated in integrating the component into a product, the integration caused the product to be defective, and that defect caused injury. (Rest.3d Torts, Products Liability, § 5; *O'Neil v. Crane Co.*, *supra*, 53 Cal.4th at p. 355.) The rationale for this defense is that, while component part sellers should be responsible for defects in their own product, and must warn purchasers about risks associated with the use of their product, they cannot reasonably be expected to monitor the development of all potential products into which their components are integrated. (Rest.3d Torts, Products Liability, § 5, coms. a & b, pp. 130-133.) Thus, "when a sophisticated buyer

10

integrates a component into another product, the component seller owes no duty to warn either the immediate buyer or ultimate consumers of dangers arising because the component is unsuited for the special purpose to which the buyer puts it." (*Id.*, § 5, com. b, p. 132.) Like the sophisticated user defense, the component parts defense applies to both strict liability and negligence claims. (*Taylor v. Elliott Turbomachinery Co. Inc.*, *supra*, 171 Cal.App.4th at pp. 584, 595-596.)

### 3) *Bulk Supplier Doctrine*

In addition to manufactured items, raw materials can also be components of a finished product. The bulk supplier doctrine describes a particular application of the component parts doctrine for raw materials supplied in bulk and intended for further processing.

Origins of the bulk supplier rule can be traced to the Restatement Second of Torts, which stated a rule of strict liability for the sale of a dangerous product that "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." (Rest.2d Torts, § 402A, subd. (1)(b).) The provision included a caveat for products that are "expected to be processed or otherwise substantially changed" before reaching the end user. (*Id.*, Caveat, subd. (2), p. 348.) The drafters explained that liability in such cases would likely depend on "whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party" that further processes the material. (*Id.*, com. p, p. 357.)

The most recent Restatement of Torts addresses the bulk supplier doctrine explicitly. Comment c to the Restatement Third of Torts, section 5, describes the specific application of the component parts doctrine to raw materials. It provides that a bulk supplier is liable for harm caused by "contaminated or otherwise defective" raw materials but notes that "a basic raw material such as sand, gravel, or kerosene cannot be defectively designed." (Rest.3d Torts, Products Liability,

11

§ 5, com. c, p. 134.)[8]  Nor are raw material sellers liable for injuries caused by the defective design of a finished product.  (Rest.3d Torts, Products Liability, § 5, com. c, p. 134.)  "Inappropriate decisions regarding the use of such materials are not attributable to the supplier of the raw materials but rather to the fabricator that puts them to improper use."  (*Ibid.*)  Finally, comment c observes that failure to warn liability would be unduly onerous because it would require raw material suppliers "to develop expertise regarding a multitude of different end-products and to investigate the actual use of raw materials by manufacturers over whom the supplier has no control."  (*Ibid.*)

 *Artiglio v. General Electric Co.*, *supra*, 61 Cal.App.4th at page 837, examined the bulk supplier defense in detail.  In *Artiglio*, the plaintiffs sued for injuries from breast implants.  They claimed the implant manufacturer and a supplier of component silicone compounds were negligent in failing to warn customers about the health risks of silicone in medical devices.  (*Id*. at pp. 833-834.)  Building on earlier case law and related federal decisions, the court held that raw material suppliers owe no duty of care to consumers of the finished product when four conditions are met:  (1) the material supplied is not inherently dangerous; (2) the material is sold in bulk to a sophisticated buyer; (3) the material is substantially changed during the manufacturing of a finished product; and (4) the supplier has a limited role in creating the finished product.  (*Id*. at p. 839.)  Applying these factors, the court concluded the silicone supplier had no duty to warn implant recipients about the health hazards of silicone, even though the supplier was aware of how its raw material was being used.  (*Id*. at p. 841.)  Given

---

[8]  Notably, the Third Restatement rejects the consumer expectations test for proving design defect liability.  (See Rest.3d Torts, Products Liability, § 2, com. g, pp. 27-28.)  This position is contrary to California law, which allows a design defect to be shown by either the consumer expectations or the risk utility test.  (See *ante*, at p. 7; *Barker*, *supra*, 20 Cal.3d at p. 432.)  The present case concerns only failure to warn, and we express no view on design defect liability.

12

the supplier's limited role in the manufacturing process, "the social cost of fulfilling such a duty would far exceed the utility of imposing the duty." (*Ibid*.)

The bulk supplier defense described in *Artiglio* applies only to raw materials that are not inherently dangerous. (*Artiglio v. General Electric Co.*, *supra*, 61 Cal.App.4th at p. 839.) This limitation parallels the component part doctrine's requirement that the component itself not be defective. (See *O'Neil v. Crane Co.*, *supra*, 53 Cal.4th at p. 355; Rest.3d Torts, Products Liability, § 5, subd. (a).) Even if a raw material is not manufactured or designed, any dangerous product is "defective" if it is not accompanied by adequate warnings about the risk. (Rest.3d Torts, Products Liability, § 2, subd. (c); *Brown*, *supra*, 44 Cal.3d at p. 1057.)

2.      *The Sophisticated Intermediary Doctrine*

In general, a manufacturer or distributor has a duty to warn about all known or knowable risks of harm from the use of its product. (*Anderson*, *supra*, 53 Cal.3d at p. 1000; Rest.3d Torts, Products Liability, § 2, subd. (c).) This duty applies to all entities in a product's supply chain. (See *Taylor v. Elliott Turbomachinery Co. Inc.*, *supra*, 171 Cal.App.4th at p. 575.) Thus, a supplier that places a hazardous raw material in the stream of commerce has a duty to warn about the material's inherent risks. The supplier clearly has a duty to warn the material's immediate purchaser unless the purchaser is a sophisticated user and presumably already aware of the relevant risks. (See *Johnson*, *supra*, 43 Cal.4th at p. 65.) The supplier's duty also logically extends to others who encounter the hazardous raw material, for example, after it has been incorporated into a finished product.[9] However, circumstances may make it extremely difficult, or impossible,

---

[9]      In addition to users of finished products incorporating the raw material, employees of the purchaser may also encounter the raw material in their work. The question there is whether the supplier's duty to warn extends to its customers' employees. (See *Schwoerer v. Union Oil Co.* (1993) 14 Cal.App.4th 103, 110-111.) Different considerations may apply in the employer-employee context, and we express no view on how principles discussed in this opinion may apply there.

for a raw material supplier to provide warnings directly to the consumers of finished products.

The sophisticated intermediary doctrine defines the scope of the supplier's duty in this context. The doctrine originated in the Restatement Second of Torts, section 388, comment n, pages 307 to 310, which addresses when warnings to a party in the supply chain are sufficient to satisfy the supplier's duty to warn. The comment observes that warnings to a direct purchaser may not always be sufficient, and the ultimate question is whether the supplier has exercised reasonable care to ensure "that the information will reach those whose safety depends on their having it." (*Id*. at p. 308.) Whether it is reasonable for the supplier to rely on the purchaser to transmit warnings depends on several considerations, such as the reputation of the purchaser and, perhaps, the purpose for which the product is supplied. (*Id*. at pp. 308-309.) The comment did not attempt to describe all relevant factors but noted generally that "the magnitude of the risk involved," meaning both the seriousness of the potential harm and its likelihood of occurring, must be balanced against the burden that would be imposed by requiring direct warnings. (*Id*. at p. 309.)

*Persons v. Salomon North America, Inc.* (1990) 217 Cal.App.3d 168 illustrates how section 388, comment n has been applied in California. There, a manufacturer of ski bindings was sued after the bindings failed to release properly during a skier's fall. (*Persons*, at pp. 171-172.) The binding maker was aware that its bindings were incompatible with untreated thermoplastic ski boots. It had warned the ski rental facility about the problem and instructed the facility how to recognize and treat incompatible boots. It did not warn individual skiers, however. (*Id*. at pp. 171-173.) Relying on section 388, comment n, the Court of Appeal concluded the binding manufacturer had discharged its duty to warn by alerting the rental shop to the danger and reasonably relying on the shop to warn end users and take steps to avoid the harm. (*Persons*, at pp. 171-172.) This conclusion rested heavily on evidence showing it was not feasible for the

14

manufacturer to provide effective warnings directly to end users. (*Id*. at p. 176.)
The court invoked section 388, comment n, observing that when there is "no effective way to convey a product warning to the ultimate consumer, the manufacturer should be permitted to rely on downstream suppliers to provide the warning." (*Persons*, at p. 178.) Moreover, the binding manufacturer's reliance was reasonable because the rental shop "had an independent duty to exercise reasonable care in supplying this equipment and was itself subject to strict liability for failure to warn its customers of the dangerous propensities of articles it rented." (*Ibid*.)

The Restatement drafters' most recent articulation of the sophisticated intermediary doctrine appears in the Restatement Third of Torts, Products Liability, section 2, comment i, at page 30. The drafters intended this comment to be substantively the same as section 388, comment n, of the Restatement Second of Torts. (See Rest.3d Torts, Products Liability, § 2, com. i, reporter's note 5, p. 96; *Humble Sand & Gravel Inc. v. Gomez*, *supra*, 146 S.W.3d at p. 190.) Section 2, comment i explains: "There is no general rule as to whether one supplying a product for the use of others through an intermediary has a duty to warn the ultimate product user directly or may rely on the intermediary to relay warnings. The standard is one of reasonableness in the circumstances. Among the factors to be considered are the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user." (Rest.3d Torts, Products Liability, § 2, com. i, p. 30.)

We have not previously addressed how the sophisticated intermediary doctrine applies in California.[10] We now formally adopt the sophisticated

---

[10] We have, however, adopted the *learned* intermediary doctrine, a related rule that applies when drugs or medical devices are supplied in the context of the doctor-patient relationship. (*Carlin v. Superior Court*, *supra*, 13 Cal.4th at p. 1116; *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 64-65 [applying

intermediary doctrine as it has been expressed in the Restatement provisions just discussed. Under this rule, a supplier may discharge its duty to warn end users about known or knowable risks in the use of its product if it: (1) provides adequate warnings to the product's immediate purchaser, or sells to a sophisticated purchaser that it knows is aware or should be aware of the specific danger, *and* (2) reasonably relies on the purchaser to convey appropriate warnings to downstream users who will encounter the product. Because the sophisticated intermediary doctrine is an affirmative defense, the supplier bears the burden of proving that it adequately warned the intermediary, or knew the intermediary was aware or should have been aware of the specific hazard, and reasonably relied on the intermediary to transmit warnings. (See *Swope v. Columbian Chemicals Co.* (5th Cir. 2002) 281 F.3d 185, 206; cf. *Johnson*, *supra*, 43 Cal.4th at p. 65.)

Like the sophisticated user defense, the sophisticated intermediary defense applies to failure to warn claims sounding in either strict liability or negligence. (See *Johnson*, *supra*, 43 Cal.4th at p. 71.) As we have previously observed, "there is little functional difference between the two theories in the failure to warn context." (*Ibid*.) "[I]n failure to warn cases, whether asserted on negligence or strict liability grounds, there is but one unitary theory of liability which is negligence based—the duty to use reasonable care in promulgating a warning." (*Higgins v. E.I. DuPont de Nemours & Co., Inc.* (D.Md. 1987) 671 F.Supp. 1055, 1060.)

The goal of products liability law is not merely to spread risk but also "to 'induce conduct that is capable of being performed.' " (*Hoffman v. Houghton Chemical Corp.*, *supra*, 751 N.E.2d at p. 857.) The sophisticated intermediary doctrine serves this goal by recognizing a product supplier's duty to warn but

Rest.2d Torts, § 388].) Although we acknowledged in *Macias v. State of California* (1995) 10 Cal.4th 844, 853 that the sophisticated intermediary defense is well established in product liability law, that case was resolved on a different ground.

permitting the supplier to discharge this duty in a responsible and practical way.  It appropriately and equitably balances the practical realities of supplying products with the need for consumer safety.  (See *ibid*.)

> a.  *Actual Warnings or Sophistication of Intermediary*

Under the sophisticated intermediary doctrine's first prong, generally the supplier must have provided adequate warnings to the intermediary about the particular hazard.  (See, e.g., *Humble Sand & Gravel Inc. v. Gomez*, *supra*, 146 S.W.3d at pp. 176-177; *Hoffman v. Houghton Chemical Corp.*, *supra*, 751 N.E.2d at p. 852.)  In some cases the buyer's sophistication can be a substitute for actual warnings, but this limited exception only applies if the buyer was so knowledgeable about the material supplied that it knew or should have known about the particular danger.  (See, e.g., *Cimino v. Raymark Industries, Inc.* (5th Cir. 1998) 151 F.3d 297, 334 [raw asbestos supplier did not need to warn Fibreboard, "a sophisticated, expert, and knowledgeable manufacturer" of insulation products, about asbestos risks]; *Higgins v. E.I. DuPont de Nemours & Co., Inc.*, *supra*, 671 F.Supp. at pp. 1061-1062 [highly sophisticated manufacturer acquired knowledge from independent inquiry and outside sources, including its suppliers].)  This narrow exception to the duty to warn is consistent with our recognition in *Johnson*, *supra*, 43 Cal.4th at page 65, that knowledge of a product's risks is the equivalent of prior notice.  If a purchaser is so knowledgeable about a product that it should already be aware of the product's particular dangers, the seller is not required to give actual warnings telling the buyer what it already knows.  (See *ibid*.)

A raw asbestos supplier asserted the sophisticated intermediary defense in *Stewart v. Union Carbide Corp.*, *supra*, 190 Cal.App.4th 23.  The Court of Appeal rejected the defense without further analysis, however, because it concluded "that doctrine, where it applies at all, applies only if a manufacturer provided adequate warnings to the intermediary."  (*Id*. at p. 29.)  This assertion cannot be reconciled with our analysis in *Johnson*.  Sophistication obviates the need for warnings

17

because a sophisticated purchaser already knows or reasonably should know of the relevant risks. (See *Johnson*, *supra*, 43 Cal.4th at p. 65.) Although in most cases a warning to the intermediary will be necessary, warnings are not required if the intermediary was so sophisticated that it actually knew or reasonably should have known about the potential harm. (Cf. *Cabasug v. Crane Co.*, *supra*, 988 F.Supp.2d at p. 1228 [sophisticated intermediary defense would be available to asbestos product manufacturer that provided no warnings if it could establish that its buyer, the Navy, was already aware of asbestos risks].) Insofar as it expresses a different view, *Stewart v. Union Carbide Corp.*, *supra*, 190 Cal.App.4th 23, is disapproved.

Contrary to Special Electric's assertion, however, the sophistication of a product's purchaser, standing alone, may not be sufficient to discharge the supplier's duty to warn. As the Second Restatement explains, providing thorough warnings to the immediate purchaser "is not in all cases sufficient to relieve the supplier from liability. . . . The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends on their having it." (Rest.2d Torts, § 388, com. n, p. 308; see *Vondra v. Chevron U.S.A., Inc.* (D.Neb. 2009) 652 F.Supp.2d 999, 1007 ["proof that an intermediary knows the product is dangerous will not always absolve the supplier of a duty to warn ultimate consumers"].) In addition to warnings or sophistication of the purchaser, it must have been reasonable for the supplier to rely on the purchaser to warn others who would foreseeably encounter the hazardous product.

Early California cases in this area focused not on reasonable reliance, but on whether suppliers had the ability to warn end users directly. For example, *Walker v. Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669, 671, concerned injuries from a drain cleaner containing sulfuric acid. The court held it unreasonable to impose liability on the sulfuric acid supplier because the supplier had no control over compounding, packaging, or marketing the cleaning product. (*Id*. at p. 674.) Similarly, in *Groll v. Shell Oil Co.* (1983) 148 Cal.App.3d 444,

18

449, the supplier of a chemical repackaged as lighter fluid was not liable for failing to warn the lighter fluid's users because it had no means of communicating warnings to them. The court observed that a contrary holding would have imposed "an onerous burden" on raw material suppliers to monitor the packaging of finished products distributed by other companies. (*Ibid*.)

However, in a recent case involving asbestos products sold to the Navy, the Court of Appeal observed, "to avoid liability, there must be some basis for the supplier to believe that the *ultimate user* knows, or should know, of the item's hazards." (*Pfeifer v. John Crane, Inc.*, *supra*, 220 Cal.App.4th at p. 1296, italics added). Drawing upon the principles in *Johnson*, *supra*, 43 Cal.4th at page 71 and the Restatement Second of Torts, section 388, the court concluded, "the intermediary's sophistication is not, as [a] matter of law, sufficient to avert liability; there must be a sufficient reason for believing that the intermediary's sophistication is likely to operate to protect the user, or that the user is likely to discover the hazards in some other manner." (*Pfeifer*, at pp. 1296-1297.)

b.       *Actual and Reasonable Reliance on Intermediary*

To establish a defense under the sophisticated intermediary doctrine, a product supplier must show not only that it warned or sold to a knowledgeable intermediary, but also that it actually and reasonably relied on the intermediary to convey warnings to end users. This inquiry will typically raise questions of fact for the jury to resolve unless critical facts establishing reasonableness are undisputed. (See *Adkins v. GAF Corp.* (6th Cir. 1991) 923 F.2d 1225, 1230; *Hoffman v. Houghton Chemical Corp.*, *supra*, 751 N.E.2d at p. 856.)[11]

---

[11]       In *Anderson*, *supra*, 53 Cal.3d at pages 1002 to 1003, we observed that the reasonableness of a supplier's failure to warn is immaterial in the strict liability context. However, *Anderson* was addressing the reasonableness of a failure to give any warnings *at all*, whereas the question here is whether a supplier has discharged its duty to warn by providing appropriate warnings to an intermediary and reasonably relying on the intermediary to pass on warnings to end users. A reasonableness inquiry is not inconsistent with strict liability in this context.

19

Several factors are relevant in deciding whether it is reasonable for a supplier to rely on an intermediary to provide a warning. The most recent Restatement provision distills these factors into three distinct categories: "the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user." (Rest.3d Torts, Products Liability, § 2, com. i, p. 30.)

The "gravity" of risk factor encompasses both the "serious or trivial character of the harm" that is possible and the likelihood that this harm will result. (Rest.2d Torts, § 388, com. n, p. 309.) This factor focuses on the nature of the material supplied. If the substance is extremely dangerous, the supplier may need to take additional steps, such as inquiring about the intermediary's warning practices, to ensure that warnings are communicated. (See *ibid.*) The overarching question is the reasonableness of the supplier's conduct given the potential severity of the harm.

The second Restatement factor, measuring the likelihood that the intermediary will warn, focuses on the reliability of the intermediary. The supplier's knowledge about the intermediary's reliability is judged by an objective standard, based on what a reasonable supplier would have known under the circumstances. (See Rest.2d Torts, § 388, com. n, p. 308 ["known or knowable character" of the intermediary is relevant to reasonableness of relying on intermediary to warn].) Relevant concerns for this factor include, for example, the intermediary's level of knowledge about the hazard, its reputation for carefulness or consideration, and its willingness, and ability, to communicate adequate warnings to end users. (See *id.*, coms. *l* & n, pp. 307-308.) Of course, a supplier is always free to inquire about the intermediary's warning policies and practices as a means of assessing the intermediary's reliability. The Second Restatement suggests economic motivations may also be important. For example, an intermediary manufacturer may have an incentive to withhold necessary

20

information about a component material if warnings would make its product less attractive. (See *id.*, com. n, pp. 309-310; *Aubin v. Union Carbide Corp.*, *supra*, 177 So.3d at p. 515.)

It is also significant if, under the circumstances giving rise to the plaintiff's claim, the intermediary *itself* had a legal duty to warn end users about the particular hazard in question. (See *Persons v. Salomon North America, Inc.*, *supra*, 217 Cal.App.3d at p. 178.) In general, " 'every person has a right to presume that every other person will perform his duty and obey the law.' " (*Harris v. Johnson* (1916) 174 Cal. 55, 58.) As the Restatement notes, "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." (Rest.2d Torts, § 388, com. n, p. 308.) This consideration may be especially relevant in the context of a raw material or other component supplied for use in making a finished product. Under California law, a product manufacturer has a legal duty to warn its customers of all known or knowable dangers arising from use of the product. (*Anderson*, *supra*, 53 Cal.3d at pp. 1000, 1002; *Carlin v. Superior Court*, *supra*, 13 Cal.4th at p. 1113, fn. 3 [manufacturer is charged with knowledge of an expert].) However, regardless of the purchaser's independent duty, the supplier cannot reasonably ignore known facts that would provide notice of a substantial risk that the intermediary might fail to warn or that warnings might fail to reach the consumer. (Cf. *Hoffman v. Houghton Chemical Corp.*, *supra*, 751 N.E.2d at p. 858 [approving jury instruction asking whether supplier had reason to anticipate " 'negligence or other fault' " by intermediary in failing to warn end users].)

The third factor for assessing the reasonableness of relying on an intermediary explores whether it was feasible for the supplier to convey effective warnings directly to end users. (Rest.3d Torts, Products Liability, § 2, com. i, p. 30.) Whereas the first two factors focus on the product and the intermediary, this factor focuses on what the *supplier* can realistically accomplish.

When raw materials are supplied in bulk for the manufacture of a finished product, it may be difficult for the supplier to convey warnings to the product's ultimate consumers. These suppliers likely have no way to identify ultimate product users and no ready means to communicate with them. "Bulk products often are delivered in tank trucks, box cars, or large industrial drums, and stored in bulk by the intermediary, who generally repackages or reformulates the bulk product. Even if the product *could* be labeled by the supplier, any label warnings provided to the intermediary would be unlikely to reach the end user." (*Hoffman v. Houghton Chemical Corp.*, *supra*, 751 N.E.2d at p. 856.) A raw material supplier's ability to warn end users may thus differ significantly from that of a product manufacturer or distributor that sells packaged commodities or deals directly with consumers. "If the goods are packaged it is entirely feasible for the manufacturer to include an appropriate warning on the package." (*Jones v. Hittle Service, Inc.* (Kan. 1976) 549 P.2d 1383, 1393.) In addition to cautionary labels or packaging inserts, manufacturers may sometimes be able to affix a warning to the product itself. In contrast, a raw material supplier can often do little more than furnish the manufacturer with appropriate warnings and rely on the manufacturer to pass them along. (See *id*. at p. 1394; see also Ausness, *Learned Intermediaries and Sophisticated Users: Encouraging the Use of Intermediaries to Transmit Product Safety Information* (1996) 46 Syracuse L.Rev. 1185, 1232 [finished product manufacturer is typically in the best position to effectively warn consumers of the hazard].) Although this factor is not dispositive, the infeasibility of direct warnings in the bulk supplier context may weigh in favor of finding it was reasonable for the supplier to rely on an intermediary to warn.

3.     *Application in this Case*

Having discussed the evolution of related doctrines, we turn to the application of the sophisticated intermediary rule in the context presented here.

After the jury found Special Electric liable for failure to warn, the trial court overturned this verdict by entering JNOV. " 'A motion for judgment

22

notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] . . . As in the trial court, the standard of review [on appeal] is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.' " (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770.) Viewing the evidence in the light most favorable to plaintiffs, disregarding conflicting evidence, and drawing all legitimate inferences in their favor, we conclude the entry of JNOV cannot stand.

Special Electric arguably forfeited the sophisticated intermediary defense by failing to present it to the jury. Although Special Electric argued in the nonsuit and directed verdict motions that it had no duty to warn a sophisticated purchaser like Johns-Manville about asbestos, it never attempted to show that it actually or reasonably relied on Johns-Manville to warn end users. Nor did Special Electric request a jury instruction or verdict form question on the sophisticated intermediary doctrine.

Assuming the defense was preserved, the record does not establish as a matter of law that Special Electric discharged its duty to warn by reasonably relying on a sophisticated intermediary. The evidence is disputed about whether Special Electric consistently provided warnings to Johns-Manville during the relevant time frame. Special Electric contends warnings were not necessary in any event because Johns-Manville was highly sophisticated and knowledgeable about the health risks of asbestos. Although the record clearly shows Johns-Manville was aware of the risks of asbestos *in general*, no evidence established it knew about the particularly acute risks posed by the crocidolite asbestos Special Electric supplied. In addition, plaintiffs presented evidence that at least one Special Electric salesperson told customers crocidolite was safer than other types of asbestos fiber, when the opposite was true. If the jury credited this evidence, it may have found it unreasonable for Special Electric to believe Johns-Manville was

23

so sophisticated that a warning about the particular dangers of crocidolite asbestos was not called for.

Moreover, the record does not establish as a matter of law that Special Electric actually and reasonably relied on Johns-Manville to warn end users like William Webb about the dangers of asbestos. We recognize that direct proof of actual reliance may be difficult to obtain when, as in the case of latent disease, the material was supplied to an intermediary long ago. However, actual reliance is an inference the factfinder should be able to draw from circumstantial evidence about the parties' dealings. The trial record here is devoid of evidence supporting such an inference. In addition, the jury could have reasonably determined that any reliance on Johns-Manville would have been unjustified. Plaintiffs presented testimony from a former Johns-Manville employee criticizing the company's handling of asbestos warnings and asserting it had failed to warn its own workers about the hazards of asbestos before the mid-1970s.

Accordingly, because substantial evidence supports the jury's verdict against Special Electric, the trial court erred in granting JNOV.[12]

---

[12] Special Electric contends the evidence was insufficient to show Webb was exposed to crocidolite asbestos it had supplied. The Court of Appeal rejected this argument, finding substantial evidence of exposure and causation. We too conclude this alternative ground for affirming the JNOV order lacks merit. Plaintiffs introduced evidence that Webb was exposed to dust from Johns-Manville products containing trace amounts of crocidolite at roughly the same time Special Electric was supplying crocidolite asbestos to Johns-Manville. While evidence of the link could be stronger, it is nonetheless sufficient for the jury to have found that Special Electric's asbestos was a substantial factor in causing Webb's mesothelioma. (See *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 976-977; *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 476.)

## III.  DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**WERDEGAR, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

25

**CONCURRING AND DISSENTING OPINION BY**
**CANTIL-SAKAUYE, C. J.**


I agree that substantial evidence supports the jury's verdict against Special Electric Company, Inc. (Special Electric), and that the judgment of the Court of Appeal should therefore be affirmed. I disagree, however, with the majority's holding that a supplier of hazardous materials may satisfy its duty to warn end users by relying on an intermediary where the supplier fails to warn the intermediary of the dangers and knows only that the intermediary "should be" rather than "is actually" aware of the dangers.

As discussed below, the record reflects that health hazards of asbestos have long been known, but research concerning the relationship between crocidolite and mesothelioma did not begin to emerge until the 1960s. Thereafter, studies established that crocidolite is by far the most dangerous form of asbestos, and was the cause of a grossly disproportionate number of mesothelioma cases. Special Electric, which sold crocidolite to Johns-Manville Corporation (Johns-Manville), did not warn Johns-Manville or any end users of Johns-Manville's products of the dangers associated with crocidolite. The victims of mesothelioma are a graphic illustration of the tragedy that may follow the failure to warn of a product's hazards. Because a requirement that a supplier convey warnings to a direct purchaser imposes only a minimal burden, no policy reason exists to allow suppliers to rely on intermediaries even if the suppliers do not know the

1

intermediaries actually know of the dangers.  Neither the cases nor the principles the majority cites support its holding.

According to expert testimony in this case, there were reports in the 1920s linking the breathing of asbestos dust to death.  By the end of the 1930s, it was established that asbestos caused asbestosis, or scarring of the lungs, and it was clear in the 1950s that exposure to asbestos caused lung cancer.

In early studies, mesothelioma, a relatively rare cancer, was not distinguished from other lung cancers caused by asbestos, but in 1960, a study was published concerning the incidence of mesothelioma in South Africa, where crocidolite was mined.  It was not until the mid-1960s that researchers began studying whether different types of asbestos carry different risks.  According to an expert in this case, subsequent studies reflected that crocidolite caused almost all cases of mesothelioma.  One expert opined that crocidolite presents five times the risk of chrysotile asbestos, the type of asbestos mined by Johns-Manville in Quebec, and conceded crocidolite might present a risk as high as 10 times the toxicity of chrysotile.  A second expert opined that crocidolite is 500 times as toxic, and testified that others estimated its risk to be 800 times as high.  A third expert testified that one day's exposure to a significant concentration of crocidolite could cause mesothelioma.  The risk is borne not only by the individual who encounters crocidolite in the workplace, but also by those who come in contact with the individual's work clothes; family members unknowingly exposed themselves to this extremely toxic substance by hugging a loved one and laundering work clothes.

As one expert observed, mesothelioma is "a bad way to die."  The expert explained that the malignancy involves the lining of the lung, and will eventually entrap the entire lung, creating the tightening effect of a corset by preventing the lung from expanding.  The cancer also grows outward into the chest wall where it

2

irritates nerve roots, creating pain.  People with mesothelioma live, on average, 12 to 14 months.  Chemotherapy may extend their lives a few months, but will not cure the cancer.  If a patient survives surgery to remove as much of the lung lining as possible or to remove an entire lung, his or her life expectancy will be about 24 months.  Eventually, patients require oxygen 24 hours a day and increasing doses of narcotics to mitigate the pain.  In addition, as the cancer consumes muscle mass, patients become increasingly weak, losing the ability to care for themselves and finally requiring care 24 hours a day.

One of the purposes of providing warnings concerning the dangers of products is to enable the consumer or others who might come in contact with the product to choose not to expose themselves to the risks presented.  (Rest.3d Torts, Products Liability, § 2, com. *i*, p. 30.)  According to the Centers for Disease Control, during just the seven-year period from 1999 to 2005, mesothelioma was associated with more than 18,000 deaths in the United States.  (Centers for Disease Control, *Malignant Mesothelioma Mortality — United States, 1999-2005*, MMWR Weekly (Apr. 24, 2009) online at http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5815a3.htm, as of May 23, 2016.)  Presumably, had those victims been warned of the toxicity of crocidolite, most would have chosen not to be exposed to this carcinogen.  Due to the failure of participants in the stream of commerce, consumers and others were not able to make a choice to protect themselves and their loved ones from this extremely toxic substance.

In this case, we are called upon to determine how a supplier of a hazardous material may satisfy its duty to warn those who might be exposed to the hazard, and thereby enable those at risk to take steps to mitigate or entirely avoid the risk.  As the majority acknowledges, every seller in the chain of distribution has a duty to warn of known hazards, and in some cases may satisfy that duty by relying on

3

others to provide adequate warnings. (Maj. opn., *ante*, at pp. 1-2, 7, 13.) I agree with the majority that the Restatement sets forth the appropriate test for evaluating whether a supplier may rely on an intermediary to warn those who will subsequently encounter the hazard — "reasonableness in the circumstances." (Rest.3d Torts, Products Liability, § 2, com. *i*, p. 30; maj. opn., *ante*, at p. 15.) I disagree, however, with the majority's view that a supplier may satisfy its duty to warn end users by relying on an intermediary where the supplier knew only that the intermediary *should have been aware* of the specific danger. (Maj. opn., *ante*, at p. 16.)

In support of this standard, the majority relies principally on *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56 (*Johnson*), in which this court recognized the sophisticated *user* doctrine.[1] *Johnson* involved a heating, ventilation, and air conditioning (HVAC) technician's claim against a manufacturer of air conditioning equipment. The technician suffered injuries when he applied heat to air conditioner pipes, causing residual refrigerant in the pipes to release a harmful gas. HVAC technicians had generally known of this risk for decades, and material safety data sheets, which state regulations require employers to use to train their employees, noted the risk. In addition, the plaintiff

---

[1] The majority also cites two cases in which federal courts attempted to discern what standard other states would adopt. Neither case actually involved a failure to warn. (See *Cimino v. Raymark Industries, Inc.* (5th Cir. 1998) 151 F.3d 297, 334 [trial court made no finding that the supplier failed to warn the intermediary]; *Higgins v. E.I. DuPont de Nemours & Co., Inc.* (D. Md. 1987) 671 F.Supp. at pp. 1061-1062 [supplier warned the intermediary].) It also cites a case that requires actual knowledge of the purchaser's knowledge of the risks. (*Cabasug v. Crane Co.* (D.Hawaii 2013) 988 F.Supp.2d 1216, 1228 ["Defendants cannot take benefit of the sophisticated purchaser defense unless they can establish that they knew that the Navy was aware of the dangers of asbestos and that Defendants reasonably concluded that the Navy would provide warnings to its employees"].)

4

had the highest certification available from the Environmental Protection Agency, which allowed him to work on large commercial air conditioning systems.

*Johnson* held that "[t]he duty to warn is measured by what is generally known or should have been known to *the class of sophisticated users*, rather than by the individual plaintiff's subjective knowledge." (*Johnson, supra*, 43 Cal.4th at pp. 65-66, italics added.) In the course of explaining why the "should have known" standard applies, *Johnson* stated that "[i]t would be nearly impossible for a manufacturer to predict or determine whether a given user or *member of the sophisticated group* actually has knowledge of the dangers because of the infinite number of user idiosyncrasies. For example, given users may have misread their training manuals, failed to study the information in those manuals, or simply forgotten what they were taught. However, *individuals who represent that they are trained or are members of a sophisticated group of users* are saying to the world that they possess the level of knowledge and skill associated with that class. If they do not actually possess that knowledge and skill, that fact should not give rise to liability on the part of the manufacturer." (*Id*. at p. 71, italics added.)

In the course of explaining that the sophisticated user defense applies to both negligence and strict liability claims, *Johnson* stated that the focus of the defense "is whether the danger in question was so generally known within the trade or profession that a manufacturer should not have been expected to provide a warning specific to the group to which plaintiff belonged." (*Johnson, supra*, 43 Cal.4th at p. 72.) Similarly, in the course of discussing how to determine user sophistication, *Johnson* agreed that "the Court of Appeal 'correctly understood the defense to eliminate any duty to warn when the expected user population is generally aware of the risk at issue, and correctly rejected the argument that a manufacturer's duty to warn should turn on the individual plaintiff's actual understanding of the risk. Legal duties must be based on objective general

5

predictions of the anticipated user population's knowledge, not case-by-case hindsight examinations of the particular plaintiff's subjective state of mind.' . . . The timeline focuses on the general population of sophisticated users and conforms to the defense's purpose to eliminate any duty to warn when the expected user population is generally aware of the risk at issue." (*Id*. at pp. 73-74.)

Thus, *Johnson*'s sophisticated user defense applies to members of a class of individuals who should all be aware of the dangers associated with the defendant's product, such as all trained and certified technicians. The defense does not apply merely because the defendant had knowledge from which it could infer that the particular purchaser should be aware of the specific danger. Moreover, part of the rationale for the defense is that it would be nearly impossible for the defendant to determine whether a particular member of the sophisticated user group has failed to understand or has forgotten the information he or she, by virtue of training and certification, should know regarding the dangers. In contrast, in the context of a sale to an intermediary, directly providing information to the purchaser should require no more than including warnings with the offer of sale, the sales contract, or on the packaging; the supplier need not attempt to determine whether a member of a sophisticated class with which it has no direct contact lacks the knowledge expected of members of the class. In sum, *Johnson*'s reasoning does not support the majority's standard.

The majority also relies on the principle that the law should encourage conduct that is capable of being performed, and asserts that the sophisticated intermediary doctrine serves this end by permitting a supplier to discharge the duty to warn "in a responsible and practical way." (Maj. opn., *ante*, at p. 17.) It ignores the fact that the most responsible and practical way to satisfy the first prong of the sophisticated intermediary defense is for a supplier to warn the

6

intermediary of the dangers. Instead, despite the fact that a supplier of dangerous materials has a duty to warn the purchaser, the majority crafts a rule that enables a supplier to avoid both that duty and the duty to warn end users by allowing the supplier to assume its buyer is aware of the risks, based on facts that reflect only that the buyer should be aware of the risks.

There does not appear to be any policy reason to allow a supplier merely to assume a buyer is aware of the risks associated with a product. The appropriate balancing of interests focuses on encouraging safety while avoiding unreasonable burdens on commerce. (See Rest.3d Torts, Products Liability, § 2, com. a, p. 16 [in connection with design and warning defects, "[t]he emphasis is on creating incentives for manufacturers to achieve optimal levels of safety in designing and marketing products"].) Our analysis should consider whether the burden of requiring the supplier to either warn the intermediary or know the intermediary is aware of the risks outweighs the enhancement to safety that may result from such a requirement. Instead, the majority seems to focus on the balancing of competing interests in the context of litigation, stating at the outset of its opinion that the sophisticated intermediary doctrine "balances the competing policies of compensating those injured by dangerous products and encouraging conduct that can feasibly be performed." (Maj. opn., *ante*, at p. 2.)

After creating a standard that enables a supplier to shirk its duty to warn of risks associated with its product, the majority emphasizes the duty to warn in its discussion of reasonable reliance on the intermediary. It seems inconsistent, however, to allow a supplier, instead of providing a warning, to assume a buyer is aware of dangers simply if the supplier knows the buyer *should be aware*, and then to characterize as "significant" to the reasonableness of the supplier's reliance the fact that everyone has a duty to provide warnings. Under the majority's approach, if the buyer knows that the next party in the chain of distribution should

7

be aware of the dangers, the buyer may assume that next party knows of the dangers and forgo giving warnings, and so on down the chain. On the contrary, if a supplier does not actually warn its buyer, or at least actually know that the buyer is actually aware of the dangers, it should not be allowed to rely on the duty to warn in establishing reasonable reliance.

In connection with the third factor for assessing reasonable reliance — the feasibility of warning end users — the majority speculates that suppliers of raw materials "likely have no way to identify ultimate product users and no ready means to communicate with them." (Maj. opn., *ante*, at p. 22.) It is the defendant's burden to establish reasonable reliance, including any difficulties in providing warnings to end users, and there is no basis for the court's factual conclusions on this issue. The most recent case cited in support of this discussion is 15 years old. Advances in information technology over the past two decades may enable suppliers of raw materials to learn the uses to which their products are put and the populations that may be exposed to the hazards associated with the products, and to disseminate warnings to those at risk. We should not suggest to suppliers or the lower courts that the most that can be expected of suppliers of raw materials is that they try to have warnings printed on a product's label.

Clearly, this case involves grave risks and human suffering far beyond the typical case involving a failure to warn. It illustrates, however, the tragedy that may result from the failure of commercial interests to disseminate information regarding the risks associated with their products. Here, Special Electric peddled crocidolite, the most toxic form of asbestos, without providing warnings to anyone. Its reliance on the fact that Johns-Manville itself mined asbestos and conducted extensive research regarding asbestos demonstrates the superficial bases on which businesses may infer that their buyers should be aware of the special dangers posed by the products. Johns-Manville did operate a *chrysotile*

8

asbestos mine in Quebec, but according to a trial expert, the rate of mesothelioma among miners and millers of asbestos in Quebec is "very low," with only about 0.4 percent of all deaths due to mesothelioma. The expert explained that "[c]hrysotile asbestos is cleared rapidly from the lungs and also dissolves in the acid environment of the body." In contrast, crocidolite contains iron, and therefore does not break down in the body. Crocidolite is available only from Australia or South Africa; Johns-Manville did not mine crocidolite. In addition, although Johns-Manville engaged in research regarding asbestos, the research discussed at trial by a former Johns-Manville employee related to product development.

By allowing suppliers of dangerous materials to rely on general assumptions related to an intermediary's awareness of dangers to avoid their duty to warn, the majority increases the risk that end users will not receive warnings regarding dangers associated with products they encounter. Because the burden of providing warnings to a direct purchaser is so minimal, the majority's rule is not justified. Therefore, I dissent from the majority's holding concerning the first prong of the sophisticated intermediary defense.

**CANTIL-SAKAUYE. C. J.**

**I CONCUR:**

**CHIN, J.**

9

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Webb v. Special Electric Company, Inc.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 214 Cal.App.4th 595
**Rehearing Granted**

_____

**Opinion No.** S209927
**Date Filed:** May 23, 2016
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** John Shepard Wiley, Jr.

_____

**Counsel:**

Paul & Hanley, Dean A. Hanley, Anthony E. Vieira; Law Office of Ted W. Pelletier and Ted W. Pelletier for Plaintiffs and Appellants.

Horvitz & Levy, Lisa Perrochet, Curt Cutting, Jason R. Litt; Brydon Hugo & Parker, Hugo Parker, Edward R. Hugo, James C. Parker, Jeffrey Kaufman and Josette D. Johnson for Defendant and Respondent.

Shook, Hardy & Bacon, Mark A. Behrens, Christopher E. Appel and Patrick Gregory for Coalition for Litigation Justice, Inc., Chamber of Commerce of the United States of America, NFIB Small Business Legal Center and American Chemistry Council as Amici Curiae on behalf of Defendant and Respondent.

Deborah J. La Fetra for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent.

Armstrong & Associates and William H. Armstrong for Elementis Chemicals Inc., as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ted W. Pelletier
Law Office of Ted W. Pelletier
22 Skyline Road
San Anselmo, CA  94960
(415) 454-8783

James C. Parker
Hugo Parker
135 Main Street, 20th Floor
San Francisco, CA  94105
(415) 808-0300