Filed 10/29/24

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| CINDY J. WATTS,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PNEUMO ABEX, LLC,<br><br>    Defendant and Appellant. | A166781, A167476<br><br>(Alameda County<br>Super. Ct. No.<br>RG19035791) |


Watts studied automotive repair in college and, license in hand from the State of California, in 1983, at the age of 22, opened an automotive repair shop, a shop he operated until 2005. In 2019, Watts was diagnosed with mesothelioma, a rare cancer caused by exposure to asbestos, and he and his wife, Cindy Watts, filed a lawsuit naming 28 defendants alleged to have manufactured or supplied asbestos-containing products.[1] Eight more defendants were added via Doe substitutions. In the course of pretrial proceedings, 35 of the 36 defendants were eliminated by settlement or dismissal, and the case went to trial against the one remaining defendant—

---

[1] For consistency with the briefing, we refer to Steven Watts as Watts and to "Cindy" or "Mrs. Watts" in reference to Watts's spouse. We also note that by order of October 15, 2024, Cindy L. Watts was substituted in as Successor in Interest to Watts, who is deceased. We continue to refer to the Wattses as plaintiffs in the opinion.

1

Pneumo Abex, LLC (Abex), a manufacturer of brake linings. The jury returned a verdict awarding plaintiffs $2,943,653 in economic damages, $6.75 million in noneconomic damages, and $1 million for loss of consortium. The jury apportioned fault 60 percent to Abex, 25 percent to other brake manufacturers, and 15 percent to Watts.

Abex appeals, asserting two fundamental arguments: (1) Abex is entitled to a completely new trial on all issues, as the trial court erred in granting a directed verdict against Abex on its defense that Watts was a sophisticated user; and (2) at the least Abex is entitled to a new trial on allocation of fault, an argument that includes claims that the trial court erred in: (a) refusing to put other suppliers of asbestos on the verdict form; (b) precluding Abex from using plaintiffs' interrogatory responses; (c) refusing Abex's proposed instruction on Watts's duty of care as an employer; and (d) excluding the testimony of Watts's college instructor. Abex also contends that the trial court erred in its allocation of the pretrial settlements.

We conclude that the trial court erred in directing the verdict and also erred in several rulings that bore on the allocation issue. We thus reverse and remand for a new trial.

**The General Setting**

*Watts, His Background, and His Business*

Watts was born in Oakland, and grew up in Northern California with his parents, a brother, and a sister. As a teenager Watts and his brother assisted their father with his remodeling of Watts's grandmother's house and also other properties in the area. That work included working with drywall, which meant applying and sanding joint compound. That work was dusty, and Watts breathed in the dust.

Concerning this work, Abex's expert Mary Finn identified joint

compound as a friable product, and described friable products as those that easily release asbestos fibers. And plaintiffs' expert Barry Horn testified that in the 1970's joint compound more likely than not contained chrysotile asbestos and that remodeling work involving joint compound "exposed" Watts to asbestos which, in Horn's opinion, "would have increased Mr. Watts' risk of getting mesothelioma." Similarly, plaintiffs' cancer biology expert Dr. Joseph Testa was asked if Watts's exposure to construction work as a youth could explain the development of the disease. He replied it was a "possibility."[2]

Watts graduated high school in 1977, following which he attended Alameda Community College to learn automotive repair, and from which he received a certificate of completion for a two-year automotive program. After college, Watts began repairing vehicles in his garage.

In 1983, at the age of 22, Watts opened his own automotive shop: Lafayette Autoworks, located on Mt. Diablo Boulevard in Lafayette. To do so, Watts applied for a license with the California Bureau of Automotive Repair in which application he certified his agreement "to comply with all laws and regulations to the license for which [he was] applying" and "that vehicle tests and repairs [would be] performed according to bureau procedures."

A year or so later, Watts's wife Cindy joined him in the business, Watts handling the mechanic work, she the bookkeeping and customer service. The Wattses initially ran Lafayette Autoworks by themselves. As business grew,

---

[2] Watts's brother Jeffrey died of mesothelioma in 2018, at age 52. Although Jeffrey was never tested for gene mutation, Dr. Testa opined that the common denominator in both brothers becoming sick with such a rare cancer could have been the combination of their genetic susceptibility and exposure to asbestos during the remodeling work.

Watts hired Wayne Johnson to assist, and later other employees. But throughout the time the Wattses operated Lafayette Autoworks, they never had more than one or two employees at a time.

The shop moved from the Mt. Diablo Boulevard location in 1986, and continued to operate at various other locations until 2005. In 2006, Watts closed the auto repair business and began work in construction.

Lafayette Autoworks performed all types of factory-scheduled maintenance work, including "brake jobs," which, Watts testified, were four to five a week. They also inspected the brakes on most cars coming into his shop, performing approximately 25 brake inspections a week. Watts said, "[I]t was just impossible. . . without getting that dust on yourself" as dust from the worn-down friction material accumulated in the brake drums and on the brake assemblies.[3]

In 2019, at the age of 57, Watts was diagnosed with mesothelioma, a rare and usually fatal cancer of the lining of the lungs caused only by exposure to asbestos.

**The Proceedings Below**

In September 2019, Watts and his wife Cindy filed a complaint, and four days later an amended complaint, for personal injury and loss of consortium. The amended complaint named 28 defendants (and 100 Does) alleged to be manufacturers or suppliers of asbestos-containing products, including building products, automotive products, and jewelry- producing products. In November, eight new defendants were substituted in for Does,

---

[3] Watts typically cleaned brake assemblies using a brush. On some occasions—he said once or twice a week—he used compressed air, but this was messy and spread brake dust throughout the shop.

one of which, for consistency with the proceedings below and the briefing, we will call Abex.[4]

In December Abex filed its answer, which included various affirmative defenses including, as pertinent here, third party comparative fault, comparative negligence, and sophisticated user.

The case involved extensive pretrial proceedings that generated a 107-page register of actions. Along the way 35 of the 36 defendants were removed from the case, either by way of settlement or dismissal. The settlements totaled $8,531,256, of which $2,111,486 was attributable to economic damages.

By the time trial arrived, only one defendant remained—Abex. Trial against it began in July 2022, and lasted several weeks, over which time numerous exhibits were introduced,[5] many of them voluminous. Plaintiffs pursued claims for design defect and failure to warn under strict liability and negligence theories.

Much of the evidence from that lengthy trial is not pertinent to the issues on appeal, and that which is will be set forth in detail in connection with the issue to which that evidence pertains, especially with issues related

---

[4] The actual amendment substituting a defendant for Doe 6 said it was "PNEUMO ABEX LLC, Individually and as Successor-By-Merger to PNEUMO ABEX CORPORATION, f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a/ AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, Successor-By-Merger to the AMERICAN BRAKE SHOE and FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION."

[5] One hundred seventy-five of the last 176 items in the Appellant's Appendix are trial exhibits, which exhibits total over 2,100 pages.

to the jury's allocation of fault.  We set forth here the general evidence and the essence of the parties' positions.

Abex manufactured brake linings and sold them to manufacturers of aftermarket automotive brakes or original equipment manufacturers for use in brakes sold to end users.  Various entities, including Bendix, Ford, and General Motors, purchased asbestos-containing friction material from Abex, but its most significant business came from Rayloc, which manufactured brake products that were distributed to end users through the distribution system of National Automotive Parts Association (NAPA).  Individual NAPA stores ordered brakes from NAPA distribution centers, which obtained their brakes from Rayloc, which got the linings for those brakes from Abex.

For the first couple of years the Wattses ordered parts "almost exclusively" from their local NAPA dealer, after which they began to also order parts from Rox, another local auto supply house.  Even then, Watts testified, they continued to purchase most of their parts from NAPA.  After the shop moved in 1986, Watts said that NAPA remained the preferred parts supplier for "[q]uite a while," though there was evidence that after 1986 Watts purchased fewer NAPA products, purchasing more products from Rox, Carquest, and other auto parts stores.

Plaintiffs presented evidence that the dangers of asbestos were known in the scientific community since the 1930's, and that Abex's medical department was aware of the state of the art and knew that asbestos could be hazardous.  Trade groups of which Abex was a member were publishing digests concerning the association among asbestos, asbestosis, and pulmonary carcinoma as early as 1945.  And in the 1970's, articles about the potential hazards of asbestos exposure from brake work began appearing in

the industrial hygiene literature, with studies showing that grinding, beveling, and blowout of brakes resulted in significant exposure to asbestos.

Plaintiffs also introduced numerous documents from the Friction Materials Standards Institute—a trade group of which Abex and many other brake and automotive companies were members—showing that the brake industry was studying the hazards of asbestos in brakes and sharing that information with each other throughout the 1970's and 1980's. And despite the general industry knowledge that asbestos in brakes was hazardous, neither Abex nor anyone else warned Watts of those hazards until 2000.

Abex presented evidence that in the 1970's, before Watts opened his shop, the State of California had implemented regulations mandating the safe handling of asbestos-containing brakes. Abex also introduced evidence that Watts admitted to knowing back in the early 1980's that brakes were made with asbestos (although denying he knew that was "seriously" dangerous), and that brake dust generally should not be further blown around. Watts admitted he never looked at manufacturer manuals or warnings, because he believed he knew enough about doing brake work not to have to read about it. Abex also introduced portions of Watts's deposition where he admitted he never took a course on workplace safety, never took any steps to educate himself about dangers his employees might face in the workplace, and never gave his employes any training on safe work practices.

As noted, Abex's answer alleged the affirmative defense that Watts was a sophisticated user. On September 2, 2022, plaintiffs filed a motion for directed verdict on the defense, accompanied by excerpts of reporter's transcripts of two earlier proceedings. That same day Abex filed opposition and the motion was argued, following which the trial court granted it. In doing so, it said, "[T]here [are] no facts in the record from which a reasonable

7

jury could determine that he is a sophisticated user the way that sophisticated user has been defined in the cases." No further explanation was given, no discussion of what "defined in the cases" meant.

Issues arose as to the jury verdict, specifically as to which if any entities or categories of entities should be on the verdict form besides Abex and Watts. The trial court ruled it would put "other brake manufacturers" as a category on the verdict form, but not joint compound manufacturers.

The jury found for plaintiffs on all claims, allocating 60 percent fault to Abex, 25 percent to other brake manufacturers, and 15 percent to Watts. The jury awarded $2,943,653 in economic damages, $6.75 million in noneconomic damages, and $1 million for loss of consortium. The jury rejected plaintiffs' claim that Abex acted with malice, oppression, or fraud.

On September 15, 2022, the trial court entered a judgment on the jury verdict. Abex moved to vacate the judgment as premature because settlement offsets had not yet been determined, and thus the amount of damages was not certain and no final judgment could be properly entered. (Civ. Code, § 663.)

While Abex's motion to vacate was pending, Abex asked the court to reduce the economic damages award to reflect the amounts plaintiffs received from pretrial settlements, $2,111,486 of which was, as noted, attributable to economic damages. Plaintiffs argued that 50 percent of the pretrial settlements should be allocated to future wrongful death claims by Mrs. Watts and her daughter. Abex contended that the 50 percent allocation was excessive, in particular because Mrs. Watts asserted a loss of consortium claim in this action and as a matter of law could not split her cause of action between this case and a future one.

On November 28, 2022, the trial court filed its order denying Abex's motion to vacate and accepting plaintiffs' 50 percent allocation for the offset. In December 2022, Abex filed two notices of appeal, one from the September 15 judgment, and one from the November 28 order.

On March 20, 2023, the trial court entered an amended judgment accounting for the offsets. Three days later Abex filed its appeal from the amended judgment, and we ordered the appeals consolidated.

## DISCUSSION

### Directing a Verdict on the Sophisticated User Defense was Error

Abex's first argument is that it is entitled to a new trial because the trial court erred in directing a verdict against it on the sophisticated user defense. We agree.

### Directed Verdicts and the Standard of Review

We discussed the long-established law governing directed verdicts in *North Counties Engineering, Inc. v. State Farm General Insurance Co.* (2014) 224 Cal.App.4th 902, 920 (*North Counties*), there in the usual setting in which such motions arise—a directed verdict against plaintiff and for defendant. Among other things, we quoted our Supreme Court's observation that, because granting the motion removes the matter from the jury, "courts traditionally have taken a very restrictive view of the circumstances under which" a directed verdict is proper, and we went on to note how the evidence must be viewed most strongly against the moving party and resolving all presumptions, inferences, and doubts in favor of the opposing party, citing *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117–118 (*Campbell*). As our colleagues in Division Three have described it, "[a] directed verdict may be granted only when, disregarding conflicting evidence, giving the

9

evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient sustainability to support the claim or defense of the party opposing the motion, . . .” (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629—630.)

“On appeal, we decide de novo ‘whether sufficient evidence was presented to withstand a directed verdict. [Citation.] In that sense, we stand in the shoes of the trial court.’ (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 46–47.) And we will reverse if there was substantial evidence tending to prove appellants’ case and the state of the law supports the claim. [Citations.]” (*North Counties, supra*, 224 Cal.App.4th at pp. 919—920.)

We reversed in *North Counties*, as there was substantial evidence in support of plaintiff’s claim. Likewise here, in support of Abex’s defense.

**The Sophisticated User Defense**

The sophisticated user defense has its genesis in *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56 (*Johnson*), where plaintiff Johnson was a trained and certified heating, ventilation, and air conditioning technician with six years experience and a “universal” Environmental Protection Agency certification. (*Id.* at p. 61.) He alleged that his work exposed him to phosgene gas from heated R-22 refrigerant, causing him to develop pulmonary fibrosis, and sued under theories of negligence, strict liability failure to warn, and strict liability design defect. (*Id.* at p. 62.) Johnson admitted receiving the manufacturer’s “Material Safety Data Sheets” for R-

22 refrigerant, but claimed not to understand that heating the refrigerant could produce harmful phosgene exposures. (*Id.* at p. 56.)

American Standard moved for summary judgment, which the trial court granted. (*Johnson, supra,* 43 Cal.4th 56 at p. 56.) The Court of Appeal affirmed, and the Supreme Court affirmed the Court of Appeal, holding that a "manufacturer is not liable to a sophisticated user of its product for failure to warn of a risk, harm, or danger, if the sophisticated user knew or should have known of that risk, harm, or danger." (*Id.* at p. 71.) Reaching that holding, our Supreme Court made various observations, including the following:

"The sophisticated user defense exempts manufacturers from their typical obligation to provide product users with warnings about the products' potential hazards. (*In re Asbestos [Related Asbestos Cases* (N.D. Cal. 1982)] 543 F. Supp. [1142,] 1151) [*In re Asbestos*].) The defense is considered an exception to the manufacturer's general duty to warn consumers, and therefore, in most jurisdictions, if successfully argued, acts as an affirmative defense to negate the manufacturer's duty to warn. (*Ibid.*)

"Under the sophisticated user defense, sophisticated users need not be warned about dangers of which they are already aware or should be aware. [Citation.] Because these sophisticated users are charged with knowing the particular product's dangers, the failure to warn about those dangers is not the legal cause of any harm that product may cause. [Citation.] The rationale supporting the defense is that 'the failure to provide warnings about risks already known to a sophisticated purchaser usually is not a proximate cause of harm resulting from those risks suffered by the buyer's employees or downstream purchasers.' [Citation.] This is because the user's knowledge of the dangers is the equivalent of prior notice. (*Billiar v.*

11

*Minnesota Mining and Mfg. Co.* (2d Cir. 1980) 623 F.2d 240, 243 ['[N]o one needs notice of that which he already knows'].)

"[T]he sophisticated user defense evolved out of the Restatement Second of Torts, section 388 (section 388) and the obvious danger rule, an accepted principle and defense in California. [Citations.] In addition, as we explain, the defense applies equally to strict liability and negligent failure to warn cases. The duty to warn is measured by what is generally known or should have been known to the class of sophisticated users, rather than by the individual plaintiff's subjective knowledge. [Citations.]" (*Johnson, supra,* 43 Cal.4th at pp. 65—66.)

The rationale behind *Johnson* is that because a sophisticated user is charged with knowledge of the hazards of the product, the manufacturer's failure to warn is not the proximate or legal cause of any injury resulting from the product, thereby negating the justification for imposing a duty to warn in the first place. (*Johnson, supra,* 48 Cal.4th at p. 65; see *Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 187 (*Webb*) [sophisticated user defense applies to both strict liability and negligent failure to warn claims].) By the same analysis, the sophisticated user defense applies to a design defect claim based on the consumer expectations test, as a sophisticated user may not claim to be an ordinary consumer. (*Johnson v. Honeywell International, Inc.* (2009) 179 Cal.App.4th 549, 558, fn. 4.)

*Scott v. Ford Motor Co.* (2014) 224 Cal.App.4th 1492 (*Scott*) is instructive. Plaintiff Scott claimed he developed an asbestos-related disease after operating vehicle service stations for 40 years beginning in the early 1960's. (*Id.* at p. 1495.) The trial court gave a sophisticated user jury instruction, although the jury was not asked to make a specific finding on that defense. (*Id.* at p. 1499.) The jury found Ford liable for failure to warn

and 22 percent at fault, but assigned 19 percent fault to Scott himself.  (*Id.* at p. 1498.)

Ford then moved for judgment notwithstanding the verdict based on the sophisticated user defense.  (*Scott, supra,* 224 Cal.App.4th at p. 1495.)  The trial court denied the motion.  (*Ibid.*)  Division One of this court affirmed.  (*Ibid.*)  Discussing *Johnson*, the court described the sophisticated user defense this way: "In very general terms, it bars strict liability and negligence claims based on the failure to warn about a particular risk in a defendant's product if (1) the plaintiff is shown to be a 'sophisticated user' of the product and (2) the general class of similar sophisticated users knew or should have known of the particular risk alleged by the plaintiff at 'the time of the plaintiff's injury.'  [Citation.]"  (*Scott,* at pp. 1499–1500.)  And, the court went on to hold, "[s]ubstantial evidence exists to support the jury's rejection of the defense in Ford's failure to satisfy the second requirement of *American Standard*—proof that the claimed class of sophisticated users were or should have been aware of the risks associated with professional asbestos exposure throughout the period of Scott's exposure."  (*Scott,* at p. 1500.)  Implicit in this, of course, is that the first element—Scott was a "sophisticated user"— was met.

*Scott* went on to hold that the sophisticated user was not a complete defense under the facts of that case, where the plaintiff had been exposed to asbestos from Ford's products in the early 1960's and 1970's, i.e., before the state of the art indicated that mechanics would have had access to specific information about the hazards of asbestos in brakes.  (*Scott, supra,* 224 Cal.App.4th at pp. 1500–1503.)  The court observed, however, that the jury's fault allocation to the plaintiff likely reflected *some* assignment of responsibility to him as a sophisticated user.  (*Id.* at p. 1502.)

13

The evidence here was sufficient to withstand a motion for directed verdict on the sophisticated user defense.

**There Was Substantial Evidence to Support the Sophisticated User Defense**

Watts began working with asbestos-containing automotive friction parts in community college in 1978, and opened his shop in 1983, a shop for which he had to apply for a license on an application that represented his work would be "performed according to bureau procedures." The State of California had implemented regulations concerning safe work with asbestos-containing automotive parts, and in 1977, the California Department of Public Health sent a letter to vehicle mechanics summarizing these regulations. The letter stated it was "intended to make [motor vehicle repair facilities] aware that California employers who use or work with asbestos face new legal responsibilities for worker protection as part of an expanded State program to prevent job-related cancer. As you know, *brake linings and other friction materials used in your industry contain asbestos*, which in fiber form is a known cause of human cancer."

The letter advised that certain asbestos reporting requirements had to be satisfied unless the facility was registered with the Bureau of Automotive Repair. Businesses registered with the bureau, like Watts's shop, were not required to report "because they [were] obligated to register annually with the bureau. But they [were] not otherwise exempt from State regulations requiring that employees be protected from unsafe exposure to asbestos dust."

All of Watts's claimed exposure to asbestos from Abex occurred after the late 1970's, that is after the Occupational Safety and Health Administration (OSHA), Cal/OSHA, and other government entities began to

14

regulate the handling of asbestos-containing automotive parts. And as plaintiffs' own brief acknowledges, "Watts understood that his shop was subject to OSHA and Cal/OSHA regulations regarding workplace safety."

In *Kesner v. Superior Court* (2016) 1 Cal.5th 1132 (*Kesner*), our Supreme Court held that employers and property owners had a duty to members of a worker's household to prevent take-home exposure to asbestos, as it was foreseeable that people who work with or around asbestos may carry asbestos fibers home with them. (*Id*. at p. 1146.) Discussing the issue of foreseeability, the court described the circumstances at the relevant time— the "mid-1970s"—saying this: "Moreover, at the time George Kesner and Mike Haver worked for defendants, broadly applicable regulations identified the potential health risks of asbestos traveling outside a work site. In June 1972, the federal Occupational Safety and Health Administration (OSHA) published its first permanent regulations for employers using asbestos." (*Id*. at p. 1146.) We repeat: "Watts understood that his shop was subject to OSHA and Cal/OSHA regulations regarding workplace safety."

Watts admitted in his testimony in his brother's lawsuit that he knew that brakes contained asbestos. He also said that he avoided using compressed air because he did not want to fill the air with dust, as dust could be dangerous. Thus, a jury could infer that Watts did in fact know about any dangers of asbestos in brakes as a result of his educational and/or professional training, not to mention his position as an owner-operator of a licensed automotive repair business. At the least, it could have inferred that as a member of a professional class of persons required to know about, and abide by, government warnings about how to safely work with asbestos-containing brakes, Watts should have been aware of the hazards of working with brakes and other asbestos-containing automotive friction products.

Finally, we note that Watts's own testimony supported his being a sophisticated user, with his point-blank admission that the reason he never looked at the manuals was because he felt he was "sufficiently proficient and knew how to professionally and safely perform brake jobs that [he] didn't need to consult them."

Never coming to grips with most of this evidence, plaintiffs' brief asserts in conclusory terms that the "record reflects no substantial evidence from which the jury could have found that Watts was a sophisticated user as the law defines it," no substantial evidence he had "actual knowledge," no substantial evidence he "should have known of asbestos hazards." Such reading of the record is 180 degrees from the law that requires the evidence be interpreted "most favorably" to Abex's case and "most strongly against [Watts] and resolving all presumptions, inferences and doubts in favor of [Abex] . . . ." (*North Counties, supra*, 224 Cal.4th at p. 920.)

Plaintiffs assert that Watts's peer group was "owners/operators of small automotive repair shops" which, the argument apparently runs, somehow exempted him and his "peer group" from the responsibility to know about, and comply with, Cal/OSHA regulations. Plaintiffs offer no authority to support the argument, and we have found none. Indeed, the 1977 letter from the California Department of Public Health specifically stated that registered automotive repair shops were "*not otherwise exempt* from State regulations requiring that employees be protected from unsafe exposure to asbestos dust." Not only that, Watts knew that OSHA regulations governed his shop.

Plaintiffs argue as a fallback that Watts did not immediately employ others, so there was at least some time he was not subject to Cal/OSHA, apparently thus some time in which he was not a sophisticated user. But the fact Watts may not have employed anyone other than himself at first does not

16

preclude a reasonable inference that as part of his due diligence in obtaining his business license and certifying he would comply with relevant regulations, he should have learned about the applicable Cal/OSHA regulations before employing others.

Plaintiffs admit that Watts learned of the dangers of asbestos, but only, as plaintiffs' brief puts it, "not until he started to hear 'rumblings' through the trade and in the media in the late 1990s or early 2000s that he learned that asbestos in brakes posed a health hazard." Maybe. Maybe not.

But even if this were true, it would not have negated the defense. That is, Watts presented a theory of causation based on cumulative asbestos exposure increasing his risk of cancer over time. And a reasonable jury could have concluded that had Watts started taking precautions a year after opening his shop, he could have limited his cumulative dose and prevented the ultimate harm.[6] In short, plaintiffs' argument that Watts was not a sophisticated user at the outset only gives rise to additional factual causation issues. It is not a basis for taking the sophisticated user issue from the jury.

Plaintiffs essentially rely on two cases: *Moran v. Foster Wheeler Energy Corp.* (2016) 246 Cal.App.4th 500 (*Moran*) and *Buckner v. Milwaukee Electric Tool Corp.* (2013) 222 Cal.App.4th 522 (*Buckner*). Neither supports Watts—if anything, *Buckner* can be read as supporting Abex.[7]

---

[6] Plaintiffs themselves as much as admitted this, their counsel playing a video in closing argument saying that "even if you've been exposed to asbestos, you can still take steps to protect yourself."

[7] Plaintiffs also cite, without discussion, *Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582. There, the Court of Appeal held that defendants were not entitled to summary adjudication on their sophisticated user defense in a case involving a construction worker who used transite pipe. (*Id.* at pp. 502, 604.) Abex is not seeking adjudication in its favor on the defense, only a trial.

17

*Moran* involved a salesperson of asbestos-containing insulation. And the trial record contained no evidence on how "the general state of knowledge in science, medicine, and industry" could have been imputed to salespersons like plaintiff. (*Moran, supra,* 246 Cal.App.4th at p. 549.) Watts was not a mere salesperson, but both a college trained mechanic and an employer, with responsibilities and obligations a salesperson like Moran did not have.

Buckner was injured when the drill he was using counterrotated. (*Buckner, supra,* 22 Cal.App.4th at p. 527.) He sued the drill manufacturer for failing to include a warning on the drill that it could not be safely used without a side handle. (*Id.* at pp. 527–528.) At trial, defendant argued that Buckner was experienced in using power tools, knew of the risk of drill counterrotation, and was thus a sophisticated user of the drill. (*Id.* at p. 528.) The jury agreed and found for defendant. (*Id.* at p. 529*.)* The trial court granted plaintiff a new trial, finding that Buckner was not a sophisticated user because he was merely a "handyman" rather than a licensed contractor, had no formal training in tool safety, and was not specifically aware of the need for a side handle. (*Id.* at p. 531.)

The Court of Appeal affirmed the new trial under the highly deferential abuse of discretion standard of review for such rulings. (*Buckner, supra,* 22 Cal.App.4th at p. 537.) But the court did not consider—and certainly did not hold—that the sophisticated user defense failed as a matter of law, that the issue had been improperly sent to the jury in the first place. (*Id* at pp. 537–539.)

Based on ordinary negligence principles alone, the jury assigned 15 percent fault to Watts. A jury instructed on the sophisticated user defense could have reasonably found that the defense applied, which would have provided a complete defense to Abex. (*Johnson, supra,* 43 Cal.4th at p. 65

18

["defense applies equally to strict liability and negligent failure to warn cases"]; *Webb, supra,* 63 Cal.4th at p. 187.) At the least, as *Scott* held, such instruction could have supported a larger appointment of fault to Watts. (*Scott, supra,* 224 Cal.App.4th at p. 1502.)

**The Allocation Issues**

*Proposition 51 and the General Rules*

Under Proposition 51 liability for noneconomic damages is several only, and responsibility must be apportioned to all whose actions caused harm. (Civ. Code, § 1431.2; *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 599 (*DaFonte*).) As *DaFonte* described it: "The express purpose of Proposition 51 was to eliminate the perceived unfairness of imposing 'all the damage' on defendants who were 'found to share [only] a fraction of the fault.' ([Civ. Code,] § 1431.1, subd. (b).) In this context, the only reasonable construction of [Civil Code] section 1431.2 is that a 'defendant['s]' liability for noneconomic damages cannot exceed his or her proportionate share of fault *as compared with all fault responsible for the plaintiff's injuries*, not merely that of 'defendant[s]' present in the lawsuit. (Cf., *Evangelatos* [(1988)] 44 Cal.3d [1188], 1242, fn. 4, conc. & dis. opn. of Kaufman, J. [damages must be apportioned among ' "universe" of tortfeasors' including 'nonjoined defendants'].)" (*DaFonte, supra*, 2 Cal.4th at p. 603.)

A jury's allocation of fault is reviewed for substantial evidence (*Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 147), and if the evidence does not support the allocation, the judgment must be reversed for a new trial. (*Schelbauer v. Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 458.)

**Abex's Argument**

As noted, the jury allocated 60 percent fault to Abex, 25 percent to other brake manufacturers, and 15 percent to Watts. As to this, Abex argues

19

that "at the least, [it] is entitled to a new trial on allocation of fault," that the evidence cannot support the 60 percent fault allocation to it.

Abex's argument is lengthy and detailed, and begins with the assertion that Watts had no way to identify any Abex lining and never identified any brake that came in a box with an Abex brand label—an assertion with which plaintiffs' brief does not take issue. And, Abex goes on, it did not become a majority supplier to Rayloc's remanufacturing operations until 1984; that plaintiffs presented no evidence of what percentage of Rayloc brakes were made with Abex linings from 1982 to 1984; and that even during the relatively brief period when Abex was the "majority" supplier, it was at most a 62 percent supplier. Moreover, the evidence was uncontradicted that Abex stopped manufacturing asbestos-containing brake linings in 1987.

Watts testified he bought NAPA "parts" 75 percent of the time. But not all "parts" are brakes,[8] not all brakes from NAPA stores are Rayloc, and not all Rayloc brakes contained Abex linings. As Abex sums up, "On this record, there was no way for the jury reasonably to distinguish between the causal role of Abex products versus other companies' brake products other than by evaluating the relative frequency with which Watts encountered them. On that basis, no reasonable jury could have found Abex *alone* to be 60 percent at fault while finding Bendix (a brand Watts used often in his training and

_____

[8] Watts was asked on direct examination to name the "parts" purchased from NAPA and identified over 20. This was his answer: "Oil filters, air filters, fuel filters, spark plugs, points, condensers, distributor caps, rotors, belts, hoses, alternators, starters, all brake components from the master cylinder back to the friction material to replacement drums, spring kits, light bulbs, chemicals, carb cleaner, carburetor repair kits, transmission filter kits, fluids, specialty fluids, brake fluids, windshield washer fluid. [¶] There's a lot of other stuff, too, electrical components, there's hundreds of electrical components they had relays and switches and flashers and things like that. That's the major majority that I gave you."

ordered 'frequently' at his shop, EIS) a brand he used 4–5 times a week, and all the other manufacturers of automotive friction products collectively only 25 percent at fault."

As noted, the evidence was uncontradicted that Abex stopped manufacturing asbestos-containing brake linings in 1987, confirmed by the acknowledgement in plaintiffs' own brief that Watts experienced exposure from brake linings manufactured by Abex "[f]rom approximately 1983 to 1987." Those few years represented a fraction of the 24 years Watts's shop was in existence—a fraction of the many years he was exposed to products containing asbestos.

Plaintiffs' brief acknowledges that there is "some superficial appeal" to Abex's argument, but asserts that the issue is "not purely mathematical." And as to Abex's argument, plaintiffs' brief summarizes: "Review of the entire record, and not just the self-serving version which Abex presents, does not compel a finding that Watts's work with other manufacturers' brakes exceeded his work with Abex-lined brakes. The jury could have interpreted the evidence in the manner insisted upon by Abex, but it did not have to on the evidence put before it. [Citation.] NAPA supplied 75 percent or more of the brakes that Watts worked with between 1983 and the late 1980s. The *majority* of those brakes were Rayloc. Rayloc obtained *most* of its asbestos-containing friction linings from Abex." (Italics added.)

As noted, the years involved are few, and "majority" and "most" are hardly descriptions disposing of Abex's argument, an argument that is strong indeed. But in light of our holding on the sophisticated user defense, we need not decide it. However, for the benefit of the court on remand, we discuss some of the rulings involved on issues that pertained to allocation—as several of those of which Abex complains were erroneous.

21

**The Verdict Form**

As noted, when settling the verdict form, Abex requested that besides Abex, Watts, and other brake manufacturers, it include manufacturers of asbestos-containing joint compound a product Watts encountered as a teenager. The court refused, with this observation: "The evidence that I recall was that not all joint compound had asbestos, and there's no evidence in this case that I've heard that tells us that Georgia Pacific joint compound at a point in time when Mr. Watts used it had asbestos or didn't have asbestos. [¶] There's just no—I haven't seen any evidence on that score, and that being the case, you just haven't crossed the threshold where a jury could make a determination that, in fact, joint compound put Mr. Watts at risk."

But there was such evidence, the testimony of plaintiffs' own expert Barry Horn, which was this:

"Q. And if somebody were working with tape joint compound in the mid '70s, in all likelihood, in your opinion, that's tape joint compound that would have contained chrysotile asbestos, correct?

"A. Correct. [¶] . . . [¶]

"Q. And at least in terms of your understanding in this case, before Mr. Watts became a brake mechanic, when he was living at home as a teenager, there was remodel work going on and in your opinion, he was exposed to tape joint compound, correct?

"A. That's correct.

"Q. In your opinion, that would have increased his risk of getting mesothelioma, correct?

"A. Correct."

Horn added, "The central issue here is, was an asbestos- containing product worked with in such a way that free asbestos fibers are in the air. [¶]

22

If the answer is yes, that person has to breathe and they will inhale free asbestos fibers, then that exposure puts him at risk for developing mesothelioma, and it really doesn't matter to me who the manufacturer was." And that opinion would apply to "someone who worked with a joint compound."

Plaintiffs' own brief admits this, stating that "[p]laintiffs' expert in medical causation, Barry Horn, opined that exposure to asbestos from joint compound would have increased Watts's risk of developing mesothelioma. He also testified that joint compound, generally, likely contained asbestos in the mid-1970s." As noted, plaintiffs' cancer biology expert Dr. Testa acknowledged it was a "possibility" that Watts's exposure to construction work as a teenager could have triggered the development of the disease. And we end this discussion with an observation from *Scott*: "Exposure to asbestos does not cause the immediate appearance of cancer. Instead, the disease has a long latency period; an exposure can result in the development of cancer from 20 to as many as 70 years later. Exposure that occurs earlier in a person's life has greater potential to contribute to the development of mesothelioma than later exposure." (*Scott, supra*, 224 Cal.App.4th at p. 1496.)

Joint compound manufacturers should have been on the verdict form.

**The Ruling on the Interrogatories**

Abex served interrogatories on Watts, to which he provided verified responses. Pursuant to Code of Civil Procedure section 2030.410,[9] Abex sought to use some of Watts's responses, examples of which Abex distills in

---

[9] Which provides: "At the trial or any other hearing in the action, so far as admissible under the rules of evidence, the propounding party or any party other than the responding party may use any answer or part of an answer to an interrogatory only against the responding party."

its brief: "The responses state, for instance, that Watts 'sustained exposure to asbestos and asbestos-containing products for which Honeywell International Inc. . . . is liable from approximately 1975 to 2001.  [¶] . . . Mr. Watts had various suppliers over the years, including Lafayette Auto Parts, Rox, and Complete Auto Supply, but he purchased Bendix brand brakes from all of these suppliers."  The responses also included Watts's verified answer describing his being exposed to asbestos from no fewer than 13 other entities, some of which were building supply stores where Watts purchased joint compound: Goodman Building Supply, Truitt & White Lumber, and Ashby Lumber.

The issue first arose at a hearing on September 1, 2022.  The court expressed skepticism about putting joint compound suppliers on the verdict form, and counsel for Abex stated it intended to present Watts's interrogatory responses, including those related to joint compound.  Though the parties were to meet and confer further, the court indicated its intention to sustain plaintiffs' objections to the interrogatories unless Abex had specific evidence about the asbestos content of the products and how often Watts used them.

On September 6, 2022, the court held a further hearing on the issue, in the course of which the court interjected in this colorful way: "Whoa, you're going to take Mr. Watts'[s] word that he was exposed to asbestos?"  And the court went on to hold that Abex could not use the interrogatory responses because Watts was not competent.

Under the "rules of evidence" referenced in Code of Civil Procedure section 2030.410, a statement made outside of court that amounts to an admission is admissible even if the person making the statement might be said to be incompetent or unqualified to make it.  As we put it almost 50 years ago: "The rules pertaining to the necessary foundation for conclusions

24

are not applicable to out-of-court admissions . . . ." (*Levy-Zentner Co. v. Southern Pacific Transportation Company* (1977) 74 Cal.App.3d 762, 787.) Or, as our colleagues in Division One have put it, "Admissions contained in depositions and interrogatories are admissible in evidence to establish any material fact.  (Evid. Code, § 1220.)" (*Leasman v. Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 380.)

The court's ruling precluding Abex from introducing Watts's interrogatory responses was prejudicial error for at least two reasons.

First, had Abex been able to point to Watts's admissions about how many other brake brands he worked with and the suppliers of those products' suppliers—Carquest, Rox, Southern Auto, Ford, Toyota, Bendix, EIS, Wagner, Raybestos—the jury might have allocated more fault to those brake manufacturers as a group—and less to Abex.

Second, and more importantly, Abex's inability to present the evidence of Watts's interrogatory admissions regarding other asbestos exposure was particularly prejudicial with respect to the issues concerning suppliers of joint compound, especially as the court ruled, however erroneously, that there was insufficient evidence in the record to place them on the verdict form at all.  The evidence from the interrogatory responses would have filled any gaps in proof the trial court perceived that joint compound also contributed to Watts's disease.

Plaintiffs do not argue that the responses were inadmissible or otherwise attempt to defend the trial court's ruling on the merits.  Rather, plaintiffs argue waiver.  We read the record differently.

In response to the trial court's statement that the interrogatory responses contained answers that Watts was not competent to provide, Abex's counsel argued that "it's a statement of a party opponent that's

25

verified"; and, counsel repeatedly said, the information Abex was seeking to admit was in plaintiffs' own discovery responses. In short, Abex's counsel argued that any factual answer in a verified interrogatory response was admissible, and Watts's purported lack of competency immaterial.

Abex's counsel also made an alternative argument that the responses were at least admissible to the extent they were independent competent evidence of the same facts already admitted. But that fallback position does not constitute a waiver of Abex's request to admit the verified interrogatory responses as party admissions.

The court had already indicated days earlier that it was not going to allow the interrogatories unless Abex also presented further specific exposure evidence. And when it ruled here, it said, "As a blanket matter, if you've asked [Watts] about what products contain asbestos, you can ask him about his belief, but that's not something that can be introduced into evidence." In light of such a definitive ruling, it would have been futile for Abex to do more. (Evid. Code, § 354, subd. (b); see generally *People v. Morton* (2008) 159 Cal.App.4th 239, 249 ["The failure to make a futile argument does not amount to a waiver"].)

None of the authorities plaintiffs cite in support of their waiver argument involves the exclusion of evidence. Indeed, one of the cases cited, *Boyle v. CertainTeed Corp*. (2006) 137 Cal.App.4th 645, confirms that Abex was not required to elaborate to preserve the issue, the court there holding that "a party's challenge to a procedure is sufficient to preserve the issue on appeal if the challenge alerts the court to the alleged error, even without elaboration through argumentation and citation of authority." (*Id.* at p. 650.)

**Refusal of Abex's Proposed Instruction**

Abex proposed an instruction that read, "An employer has a duty to its employees to furnish them with a safe place to work. The employer's duty to maintain a safe workplace encompasses many responsibilities, including the duty to inspect the workplace, to discover and correct a dangerous condition, to give an adequate warning of dangers conditions, to use safe practices and procedures, and to provide and use appropriate safety devices and safeguards." The instruction was taken from *Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1045–1048 (*LAOSD Asbestos Cases*), which was an action for asbestos-caused harm.

While "judicial opinions are not written as jury instructions and are notoriously unreliable as such" (*Bevis v. Terrace View Partners,* LP (2019) 33 Cal.App.5th 230), plaintiffs did not object that the instruction was an incorrect statement of law. Rather, they objected that the instruction did not apply to product liability cases and that Watts owed no duty of care to himself. The trial court refused the instruction on the ground it did not apply. This, too, was error.

The trial court must instruct on the law applicable to the facts developed by the evidence and every reasonable theory that the evidence supports. (*Herbert v. Lankershim* (1937) 9 Cal.2d 409, 482; *Veronese v. Lucasfilm* (2012) 212 Cal.App.4th 1, 28.) Comparative fault principles apply in strict liability actions (*Daly v. General Motors Corp. (*1978) 20 Cal.3d 725, 742), under which principals a jury can allocate fault to the plaintiff himself on the theory that he failed to use reasonable care for his own protection. (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 810.)

As indicated above, Watts admitted that he took no actions to investigate safe handling of brakes or applicable asbestos regulations. He

also denied paying attention to the product boxes and denied looking at manuals or safety warnings. Abex also introduced portions of Watts's deposition where he admitted he never took a course on workplace safety, never took any steps to educate himself about dangers his employees might face in the workplace, and never gave his employes any training on safe work practices.

With the instruction refused, the case went to the jury on the theory that Watts was no different from anyone on the street, the jury unaware that there was law that imposed on him additional duties as an employer. The jury assigned 15 percent fault to Watts, based only on the instructions concerning the ordinary person standard. While an ordinary person might not be expected to pay closer attention to the products he was handling or take affirmative steps to investigate potential workplace hazards, an employer is expected—indeed, required—to do more. Had the jury been instructed about the specific duties of care Watts owed by one who owned his own business and employed others, the jury could reasonable have assigned more fault to him. It is one thing to fail to take reasonable steps to protect oneself. It is quite another to fail to take reasonable steps to protect others.

Plaintiffs argue that the court's refusal of the instruction did not prejudice Abex because the jury heard much evidence about the applicable OSHA regulations. Plaintiffs also argue that Abex was not prejudiced because it made its position on Watts's comparative fault clear in closing argument. But without an instruction on the legal duties of employers, the jury had no guidance about how important the Cal/OSHA evidence was to Watts's conduct and state of mind.

**The College Instructor's Testimony**

Watts testified he was not taught in college how to safely handle brakes, nor taught not to blow out brake dust using compressed air. In response, Abex sought to introduce the testimony of Otis Brock, one of Watts's community college instructors, for the limited purpose of rebutting Watts's testimony. After taking a mid-trial discovery deposition, plaintiffs objected to Brock's testimony under Evidence Code sections 350 and 352, arguing that Brock was unable to say when he learned of asbestos hazards or whether he taught about the use of dust prevention measures when Watts took his class.

The trial court held a hearing under Evidence Code section 402, at which hearing Abex established that Brock knew that brakes contained asbestos, that asbestos was "bad for one's health," and that "this is something that [he] instructed [his] students between the mid '70s and early '80s." Brock also testified that after 1974, he used methods other than compressed air to clean brake assemblies, identifying that year because he learned that a mechanic friend had died of cancer. Specifically, Brock testified that his friend had smoked and blown out brake dust daily, and Brock disliked the dust, saying that "[i]t was just nasty stuff," and "we stopped doing it because I thought it was nasty."

Brock was asked on cross-examination when he began teaching his students they needed to protect themselves from asbestos exposure, and clarified that "we didn't really talk about asbestos. We talked about dust." Brock did not remember teaching his students about asbestos hazards specifically; admitted he had no idea who Watts was or what he looked like; and could not say that Watts was in his class on a day he talked about brake blowout.

Following some criticism of some aspects of Brock's testimony, the trial court stated that Brock "was very clear that [] brake dust is, in his words, just nasty. And that's what he was trying to avoid. And what that does is it really pushes down the relevance of his testimony, so much so that the amount of time that's going to be spent with this witness is disproportionate, it's going to confuse the jurors and a very small amount of relevance. [¶] And because of that, I'm going to grant the motion to exclude Mr. Brock from testifying on [section] 352 grounds. And that's it."

"Evidence Code section 352 vests the trial court with discretion to 'balance the probative value of offered evidence against its potential of prejudice, undue consumption of time, and confusion.' " (*640 Octavia, LLC v. Pieper* (2023) 93 Cal.App.5th 1181, 1191.) And a trial court's exercise of discretion under Evidence Code section 352 "will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

We cannot say that in light of the record described above the trial court's ruling here was an abuse of discretion. That said, if the issue surfaces at retrial, it may or may not be with the same record as here.

**The Offset Issue**

Code of Civil Procedure section 877 provides that a non-settling defendant is entitled to a credit against its joint liability for economic damages for that portion of the settlement proceeds that are properly attributable to the plaintiff's claims for economic damages resolved at trial. (*Hackett v. John Crane, Inc.* (2002) 98 Cal.App.4th 1233, 1239.) When the settlements encompass claims not resolved at trial, such as heirs' potential future claims for wrongful death, the portion of the settlement allocable to

those claims must be deducted from the sum used to calculate the offset. (*Id.* at p. 1240.) "The trial court has wide discretion in allocating portions of a prior settlement to claims not adjudicated at trial." (*Id.* at p. 1242.)

As noted, Abex asked the court to reduce the economic damages award to reflect the amounts plaintiffs received from pretrial settlements, $2,111,486 of which was attributable to economic damage. Plaintiffs argued that 50 percent of the pretrial settlements should be allocated to future wrongful death claims by Mrs. Watts and her daughter, leaving only $1,171,597 to offset the economic damages award. Abex contended that the 50 percent allocation was excessive, in particular because Mrs. Watts asserted a loss of consortium claim in this action and as a matter of law could not split her cause of action between this case and a future one.

The trial court ruled for plaintiffs, a ruling Abex contends was an abuse of discretion, in these words: "Here, while some limited allocation might be appropriate for Watts's adult daughter's future wrongful death claim, the trial court's 50 percent allocation, which depended on a sizeable allocation for Mrs. Watts's future wrongful death claim, is excessive. Mrs. Watts has no future wrongful death claim entitled to an allocation." The argument is based on *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788 (*Boeken*), which Abex describes in these terms: "[T]he Supreme Court addressed whether a spouse who recovered for loss of consortium in her husband's personal injury action could later file a wrongful death action. The Supreme Court said no; the wrongful death action was precluded by the spouse's recovery in the personal injury action."

Abex reads *Boeken* too broadly.

Plaintiff Judy Boeken's husband Richard was diagnosed with lung cancer, and in March 2000 sued Philip Morris. (*Boeken, supra,* 48 Cal.4th at

31

p. 792.)  He won, but the trial court reduced the punitive damage award, and both sides appealed.  (*Ibid*.)  While the appeal was pending, Richard died. (*Ibid*.)

Meanwhile, in October 2000, while Richard was still alive, plaintiff filed a separate action for loss of consortium, seeking compensation for the loss of her husband's companionship and affection.  (*Boeken, supra,* 48 Cal.4th at p. 792.)  For reasons unexplained in the record, some four months after plaintiff filed the action, she dismissed it with prejudice.  (*Id.* at p. 793.)

A year after that dismissal Richard died, and plaintiff filed a wrongful death action "again seeking compensation . . . for the loss of her husband's companionship and affection."  (*Boeken, supra,* 48 Cal.4th at p. 793.)  Philip Morris demurred, arguing that plaintiff's action was barred by res judicata because plaintiff's previous loss of consortium action had "involved the same primary right."  (*Ibid*.)  The trial court sustained the demurrer; a divided Court of Appeal affirmed; and a divided 4-3 Supreme Court affirmed the Court of Appeal.  (*Ibid*.)

There, after a lengthy discussion of primary rights, the Supreme Court concluded as follows: "We conclude therefore that a plaintiff in a common law action for loss of consortium can recover prospective damages for the period *after* the injured spouse's death, based on the life expectancy that the injured spouse would have had if the injury had never occurred.  [¶]  Here, plaintiff did in fact seek such damages.  In her previous common law action for loss of consortium, plaintiff alleged that defendant's wrongful conduct had caused her husband's lung cancer and that as a result of the cancer he was 'unable to perform the necessary duties as a spouse' and would 'not be able to perform such work, services, and duties *in the future*.'  (Italics added.)  Moreover, plaintiff's complaint expressly asserted that she had been '*permanently*

32

deprived' of her husband's consortium. (Italics added.) Presumably this latter assertion was based on the debilitating and incurable nature of her husband's illness and the great likelihood that it would lead to premature death." (*Boeken, supra*, 48 Cal.4th at pp. 800—801.)

The official description of the case by the Reporter of Decisions distills the case this way: "Plaintiff's previous action sought compensation not only for the loss of consortium injury that she had suffered and would continue to suffer as a result of her husband's physical and emotional condition while he was still alive, but also for the loss of consortium injury that she anticipated she would continue to suffer as a result of his premature death. Plaintiff's wrongful death action likewise sought compensation for the loss of consortium injury that she had suffered and would continue to suffer as a result of her husband's premature death. With respect to postdeath loss of consortium, the two actions concerned the same plaintiff seeking the same damages from the same defendant for the same harm and, to that extent, they involved the same primary right." (*Boeken*, *supra,* 48 Cal.4th at p. 788.) In sum and in short, both cases sought the same damages.

The 4—3 decision involved a vigorous dissent, a dissent that not only disagreed with the majority's analysis, but also contains some observations that demonstrate that *Boeken* is not dispositive here. (*Boeken, supra,* 48 Cal.4th at pp. 803—804, dis. opn. of Moreno, J.) For example, the dissent points out that certain damages could not be sought in a pre-death situation, including, for example, loss of decedent's financial support and services and burial expenses. (*Boeken*, at pp. 807–808.) Neither of these was sought— indeed could have been sought—by Mrs. Watts here. Were that not enough, any cause of action for wrongful death would not have even accrued until

33

Watts passed away. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 404.) There was no abuse of discretion.

## DISPOSITION

The September 15, 2022 judgment, the November 28, 2022 order, and the March 20, 2023 amended judgment are reversed, and the case is remanded for a new trial. Abex shall recover its costs on appeal.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P.J.

_____

MILLER, J.

(*Watts v. PNEUMO ABEX LLC*  A166781, A167476)

35

Superior Court of Alameda County

Frank Roesch, Judge.

Horovitz & Levy, Curt Cutting, Emily V. Cuatto; Demler, Armstrong & Rowland, John R. Brydon, Edward P. Tugade, Erin S. McGahey for Defendant and Appellant.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Nadia A. Zivkov for Amicus Curiae on behalf of Appellant.

Maude Raichle Hartley French & Mudd, David. L. Amell, and Marissa Y. Uchimura for Plaintiff and Respondent.